COMMERCIAL CLEANING CORPORATION, A NEW JERSEY CORPORATION, APPELLANT, v. CHARLES F. SULLIVAN, DIRECTOR, DIVISION OF PURCHASE AND PROPERTY, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, RESPONDENT.

Argued May 24, 1966—Decided July 12, 1966.

540

Mr. *William L. Boyan* argued the cause for appellant (*Mr. George Warren,* attorney).

*Mr. Richard Newman,* Deputy Attorney General, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Alan D. Kirby,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

FRANCIS, J. In this proceeding appellant Commercial Cleaning Corporation in effect seeks a declaration that respondent, Director, Division of Purchase and Property, Department of the Treasury, State of New Jersey, improperly rejected its bid on a public contract. The action was instituted in the Appellate Division, and we certified it before argument there.

In January 1965 the Director invited bids on a one-year contract, April 10, 1965 to April 10, 1966, for the furnishing of janitorial, maintenance and related services in the new State library and archives building, the museum, auditorium and planetarium, known as the Cultural Center on West Main Street in Trenton, N. J. The specifications upon which the bids were to be furnished were minutely detailed, and called for elaborate and thoroughgoing cleaning, maintenance and janitorial services. It was obvious that a sufficiently manned and experienced organization was required for the project. In terms of space alone, 190,000 square feet had to be maintained in these buildings. To insure that the standard of performance would be met the specifications required bidders to furnish (1) evidence of net worth sufficient to assure contract performance, and (2) evidence of experience in supplying similar janitorial and maintenance services during the previous five years, or other adequate proof of qualification to meet all the demands of the contract. A statement was to be submitted outlining the claimed qualifications including "the extent of the services offered, the point from which the services will be available, the number of personnel employed regularly in the area, and the number of years the bidder has been in the business." A list of institutions or industries for which the bidder presently or previously had

similar contracts was also to be supplied. It was specified that the award would be based upon the bidder's "experience, reputation, financial stability, quality of products and services offered and after a comparison of the prices quoted." The specifications reserved to the Director "the right to reject any or all bids, or to award in whole or in part if deemed to the best interests of the State to do so." All prospective bidders were required to meet with a representative of the Division of Purchase in the Bid Room at the State House on a fixed day and make a tour with him of the areas specified in the proposal in order to acquaint themselves with the work and services to be performed.

Six bids were submitted. Commercial's bid of $67,651.20 was the lowest. Trenton Window Cleaning Co. was second with $72,447.12. The other four were substantially higher.

Commercial's bid was accompanied by a letter from its president indicating his company had been in the business in the Trenton area since 1927 and employed between 30 and 50 persons depending on the work load. He listed also certain commercial, industrial and institutional customers, and suggested they would attest to the quality of Commercial's service.

Certain staff members of the Division conducted an investigation of the bids and bidders. They held interviews with bidders and reviewed the bids. Commercial's president supported his low bid with the statement that his was a small firm and with tight supervision and low overhead he could accomplish the task. A Dun & Bradstreet report showed Commercial's sales volume for 1964 would probably total somewhat in excess of $80,000. (Thus this contract if obtained would represent more than 75% of the usual gross annual income.) The report noted also that the number of employees varied up to 25. Its work quarters were rented space 15'x30' in a two-story brick structure near the main shopping area in Trenton.

Four members of the Division staff made on-site tours of some locations presently or formerly serviced by the bidders.

Commercial had held the janitorial and maintenance contract for one sizeable plant. Its work was said to have been acceptable, but the plant representative considered Commercial too small to handle a task of that magnitude to complete satisfaction because of inability to supply enough men and equipment at all times necessary. As the result Commercial was denied the latest contract awarded although its bid was the lowest submitted. The successful applicant's bid was $22,000 higher but it was deemed better equipped to manage the job. This information was contrary to that furnished by appellant's president who said he lost the contract on account of price.

Representatives of Trenton Window Cleaning Co. were interviewed also, and some of its customers' places visited. Trenton's services were not found to be without some criticism. A Dun & Bradstreet report revealed a sales volume around $200,000 annually, with 90% of the business produced by maintenance type of work. Including part-time workers Trenton employed 60 persons. The operation was housed in a two-story brick building in Trenton, the upper floor supplying the office space and the ground floor the storage space.

The Deputy Director of Purchase and other staff members met again with Commercial's president and representatives of Trenton Window Cleaning Co. and once more reviewed the matter with them. Shortly thereafter they recommended to the Director that the low bidder, Commercial, be bypassed and the contract awarded to Trenton. The recommendation was based upon the belief that Trenton was more experienced and more adequate for the work. Commercial was considered capable of good work but too small an operation to handle the scope of work required in the Cultural Center. There was some doubt also that its bid would cover its cost. The Director accepted the view of his staff and advised Commercial that the contract was being awarded to Trenton, the second lowest bidder.

No further conference was had between the Director and his staff and Commercial, nor was any hearing given prior to or after the rejection of its bid. Nor does the record reveal that Commercial requested any further conference or a hearing after being notified that the contract was being awarded to Trenton Window Cleaning Co. See *Case v. Inhabitants of Trenton,* 76 *N. J. L.* 696, 698 (*E. & A.* 1908); *Kelling v. Edwards,* 116 *Minn.* 484, 134 *N. W.* 221, 38 *L. R. A., N. S.,* 668 (*Sup. Ct.* 1912). Apparently the contract went into operation immediately on being awarded. A few days thereafter Commercial challenged the legality of the Director's action by appealing to the Appellate Division under *R. R.* 4:88–8.

The nature of the appeal creates some procedural issues. There is also the matter of mootness. The contract period was from April 10, 1964 to April 10, 1965, and, of course, by now has been fully performed. We find no case dealing with the statute *N. J. S. A.* 52:34–12, under which the Director operates in seeking bids and in awarding public contracts. In view of the public nature of the problems presented and the likelihood of their recurrence we shall proceed to a determination of the matter on the merits. See *Dyer v. Securities and Exchange Commission,* 266 *F.* 2d 33, 47 (8 *Cir.* 1959), *certiorari* denied 361 *U. S.* 835, 80 *S. Ct.* 86, 4 *L. Ed.* 2d 75 (1959); *State by State Highway Com'r. v. Board of Chosen Freeholders of Bergen County,* 38 *N. J.* 33, 36 (1962).

■ It should be noted that appellant quite properly makes no claim for damages based upon the alleged improper failure to award it the contract. Submission of the lowest bid in answer to an advertisement for bids by the State for public work cannot be the basis of a claim for damages based upon the failure or refusal to accept such bid. *Cf. Somers Construction Co. v. Board of Education,* 198 *F. Supp.* 732 (*D. N. J.* 1962); *Malan Const. Corp. v. Board of County Road Com'rs,* 187 *F. Supp.* 937 (*E. D. Mich.* 1960); *Day v. City of Beatrice,* 169 *Neb.* 858, 101 *N. W.* 2d 481, 488 (*Sup.*

*Ct.* 1960) ; *Allen v. Eberling,* 24 *App. Div.* 2d 594, 262 *N. Y. S.* 2d 121 (*App. Div.* 1965) ; 43 *Am. Jur., Public Works and Contracts,* § 65 (1942) ; 10 *McQuillin, Municipal Corporations,* § 29.86 (*3d ed.* 1950).

Appellant contends that since it was the lowest bidder the Director could not reject its bid summarily. Lawful procedure required a hearing and a factual finding that its bid was invalid for failure of compliance with the proposal for bid or that it was not the lowest responsible bidder. In presenting this thesis reliance is placed on such cases as *Paterson Contracting Co. v. Hackensack,* 99 *N. J. L.* 260 (*E. & A.* 1923) ; *Sellitto v. Cedar Grove Township,* 133 *N. J. L.* 41 (*Sup. Ct.* 1945) ; *Sellitto v. Cedar Grove Tp.,* 132 *N. J. L.* 29 (*Sup. Ct.* 1944) ; *American Water Corporation v. Borough of Florham Park,* 5 *N. J. Misc.* 969, 139 *A.* 169 (*Sup. Ct.* 1927) ; *Kelly v. Board of Chosen Freeholders of Essex County,* 90 *N. J. L.* 411 (*Sup. Ct.* 1917) ; *Faist v. City of Hoboken,* 72 *N. J. L.* 361 (*Sup. Ct.* 1905). It is true that in these cases the courts declared it improper for the public body concerned to reject the low bid for public work without giving a hearing to the bidder before rejecting or disqualifying him. But subordinate public governmental units were involved in those controversies, municipalities and counties, not the State, and moreover they were operating under a statute which in *mandatory* terms required them to award the contract to "the lowest responsible bidder." See *N. J. S. A.* 40:50–1, as to municipalities, and *N. J. S. A.* 40:25–2, as to counties. It was said that by virtue of such a statute the lowest bidder acquired a status which entitled him to a hearing before a valid contract can be awarded to another; also that he could not be rejected in the absence of facts which would justify a belief on the part of fair-minded and reasonable men that he was so lacking in experience, financial ability, machinery, employees and necessary facilities as to be unable to perform the contract. *Sellitto v. Cedar Grove Tp., supra,* 132 *N. J. L.,* at *pp.* 32–33.

■ The Legislature has seen fit to couch the duty of the State Director of Purchase and Property with respect to the awarding of public contracts in less restrictive terms. *N. J. S. A.* 52:34–12(d) says:

"(d) award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered. Any or all bids may be rejected when the State Treasurer or the Director of the Division of Purchase and Property determines that it is in the public interest so to do."

Obviously the quoted language does not impose a mandate to, award public contracts requiring bidding to the lowest responsible bidder. Instead the legislative purpose clearly seems to be to confer on the Director broad discretion to determine who is the "responsible bidder"; which bid will be most advantageous to the State, "price and other factors considered." And he is specifically authorized to reject any bid if he determines it is in the "public interest" so to do.

■ The evolution of *N. J. S. A.* 52:34–12(d) reveals that the broader discretion granted to the State Treasurer and the Director was consciously and designedly given by the Legislature. Compare *L.* 1930, *c.* 70, § 1, *R. S.* 52:34–3 with *L.* 1954, *c.* 48, § 7, *N. J. S. A.* 52:34–12(d). It may be noted also that the statement attached to *L.* 1954, *c.* 48 (which repealed *R. S.* 52:34–1 through 5) confirms this fact. The statement shows the language of *N. J. S. A.* 52:34–12(d) quoted above was taken from the Federal Procurement Act, 41 *U. S. C. A.* § 253. We are satisfied from the antecedent history and the language of the 1954 act that the Legislature established much more flexible standards as a guide for the Director's decision to award a public contract to a particular bidder whether or not he is the low bidder. This is not to say the low bid may be ignored or treated as a minor consideration. It is a factor of great importance and not to be lightly discarded. But we are satisfied that at this particular level of State activity, the legislative plan for awarding

public contracts, which, as here, requires public advertising for bids, was to extend greater freedom of action to the Director and Treasurer than the circumscribed rule imposed on counties and municipalities. *N. J. S. A.* 52:34–6, 7. It follows also that the lawmakers' purpose was to draw in the boundaries delineating the area of judicial intervention when an attack is made on the Director's award of a contract. These considerations lead us to conclude that the courts should not and cannot substitute their discretion for that of the Director or Treasurer. In our view the judicial standard for appraising the propriety of the exercise of his discretion in awarding a contract or in rejecting a bid or a bidder should be that the courts will not interfere in the absence of bad faith, corruption, fraud or gross abuse of discretion. That rule was applied in *City of Newark v. New Jersey Turnpike Authority,* 7 *N. J.* 377, 381–382 (1951), when an attack was made on a decision of the Authority to construct a segment of the roadway on an earth base rather than, as the city demanded, by erecting a steel or reinforced concrete structure with an open base. The city charged the Authority's method was wasteful of land, neither practical nor standard construction, would interfere unduly with existing and paper streets, and with the city's master plan for future industrial development. Although the Authority's discretion was utilized in a different factual and statutory context, in our judgment the principle adopted as the basis of judicial review of the action taken ought to be the guide for court evaluation of the Director's action here. See, *Moreland v. City of Passaic,* 63 *N. J. L.* 208, 215–216 (*Sup. Ct.* 1899); *Van Reipen v. City of Jersey City,* 58 *N. J. L.* 262, 268 (*Sup. Ct.* 1895); *Gillette v. Peabody,* 19 *Colo. App.* 356, 75 *P.* 18 (*Ct. App.* 1904); 43 *Am. Jur., Public Works and Contracts, supra,* § 44, and *cf. Perkins v. Lukens Steel Co.,* 310 *U. S.* 113, 60 *S. Ct.* 869, 84 *L. Ed.* 1108 (1940).

█ It is not suggested in the present case that the Director's action in bypassing appellant's bid or in awarding the contract to Trenton Window Cleaning Company resulted

from bad faith, corruption, fraud or gross abuse of discretion. There is no doubt from the record that all the bids submitted, and particularly those of appellant and Trenton, were carefully reviewed and evaluated in light of the contemplated public project. Moreover the bidders' experience and quality of service rendered were investigated and appraised, as well as their financial capacity and organization. After the bid appellant participated in two conferences with Division staff members of considerable experience in dealing with public contracts. The only criticism Commercial makes is that it should have been given a formal hearing before its low bid was rejected and the contract given elsewhere. We are satisfied that no judicial or trial type of hearing should be required in the Director's final decision formulation in such cases. In our view, however, as a matter of good practice and fair procedure, an informal hearing or conference should be granted, *if requested* by a dissatisfied rejected bidder, particularly if he is the low bidder, prior to the execution of the contract with another bidder.

In this case, however, in view of all that was done by the Director and his staff before rejecting Commercial's bid, we cannot say any prejudice was suffered because of failure to obtain the informal hearing or conference just described. Nor do we think the record reveals Commercial has suffered any actual or potential prejudice as a future bidder on public contracts. But of primary relevance to the issue before us, we find no indication of abuse of discretion in the sense described above.

Since the courts have not dealt specifically with the statute under consideration or with the Director's or Treasurer's obligations under it, and since both parties have requested declarations with respect thereto, some comments on matters largely procedural seem advisable.

*N. J. S. A.* 52 :34–13 provides:

"The State Treasurer shall determine the terms and conditions of the various types of agreements or contracts, including provisions for adequate security, the time and amount or percentage of each pay-

ment thereon and the amount to be withheld pending completion of the contract, and he shall issue and publish rules and regulations concerning such terms and conditions, standard contract forms and such other rules and regulations concerning purchasing or procurement, not inconsistent with any applicable law, as he may deem advisable to promote competition and to implement this act." *L.* 1954, *c.* 48, § 8.

The appendix to appellant's brief contains a printed bid proposal form, obviously a standard one adopted by the Department of the Treasury. Attached thereto is what appears to be a standard printed form entitled "Terms and Conditions," which sets forth in detail instructions to bidders, a reservation of the Director's right to reject any or all bids, or to award the contract in whole or in part if deemed in the best interest of the State to do so, many references to mandatory contract provisions if the bid is the successful one, a requirement that all firms doing business with the State be registered with the Secretary of State, references to a "State Bill Form" which must be used, a warning that the bid may be rejected if all the required information is not given, etc. Attached also are standard detailed specifications "for janitorial cleaning services," New Jersey Specification No. 5730-03. Undoubtedly these forms were established pursuant to the statute referred to, and presumably similar standard ones have been promulgated to regulate bids and contracts in the various areas of public procurement of supplies and services assigned to the Department of the Treasury or the Division of Purchase and Property.

At the oral argument, however, it seemed to be conceded that no general rules or regulations have been published relating (1) to the required period of time prior to the contemplated or necessary beginning date of the public contract for the advertising for bids, (2) to a required period of time after advertising and prior to the inception date of the proposed contract for the submission of bids, (3) to a required period after submission of bids, for consideration thereof and notification of the successful and rejected bidders sufficiently in advance of the contract date to permit objectors to seek and obtain an informal hearing or conference with the Director

or his appropriate representative on their complaints. Legislative indication of the need for such departmental rules would seem to be the sense of *N. J. S. A.* 52:34–12(a), (b), (c) and (d).

The legislative intention disclosed by *N. J. S. A.* 52:34–12 is to protect the public interest in the awarding of contracts for necessary supplies and services for various State departments and agencies, to promote free and lively competition among bidders, and, within the limits of the broad discretion vested in the Director, to obtain the most advantageous contract for the State, "price and other factors considered." And it may be said reasonably that the statute bespeaks also a purpose to give fair treatment to bidders, most of whom are themselves taxpayers, consistent with accomplishment of the specified public purposes.

When public contracts are awarded to begin on the date of the award or within a few days thereafter as in this case, obviously a rejected bidder has no opportunity to seek a review of the matter by conference or informal hearing with the Department, or to pursue even the limited judicial review allowed under the rule set forth above. Moreover, the unlikelihood of a court's issuing a restraint on such a contract cannot be overlooked, nor the fact that if an ordinary judicial remedy were sought, the contract would have been fully performed before adjudication, leaving the issue moot and the taxpayer-bidder remediless.

In light of these facts, it seems reasonable to suggest that, except in unusual or emergent situations, a public agency, such as the Division of Purchase and Property, knows well in advance the approximate date upon which it will be necessary to execute a contract for supplies and services which requires advertising and public bidding. Therefore the advertising for bids and the time specified therein for their receipt ought in fairness to be sufficiently in advance of the projected contract date to give a rejected bidder, upon timely request, a conference or informal hearing at which his protest can be presented. We reject appellant's claim that a trial type hear-

ing is required. The Legislature has not provided for such a hearing and in our judgment in the area involved it is neither necessary nor consistent with the proper dispatch of government business. But the time interval referred to above between bid and execution of contract should be reasonably sufficient to permit a prompt application to an appropriate court for a summary review of the disappointed bidder's complaint which, as we have noted, would not be entertained except upon a clear showing that the Director had been guilty of bad faith, corruption, fraud or gross abuse of discretion.

Another factor, not mentioned in the briefs, nor relied upon in any way by appellant, was discussed at the oral argument. *Chapter* 35 of *Title* 52 is entitled *"Classification of Bidders."* The statute was enacted in 1931, was amended in a single particular in 1959 and has never been construed or applied in any reported case.

*Section* 1 of the act, *N. J. S. A.* 52:35–2, provides:

"Officials of the state *shall* require of all persons proposing to submit bids on public work to be furnished for or on behalf of the state or any officer, board, commission, committee, department or other branch of the state government, a statement under oath in response to a questionnaire, standardized for like classes of work, to be submitted to such persons by such state official. The statement shall develop fully the financial ability, adequacy of plant and equipment, organization and prior experience of the prospective bidder, and also such other pertinent and material facts as may seem desirable." (Emphasis added)

No person is qualified to bid on a contract who has not submitted such a statement within seven months before the opening of bids for such a contract. *N. J. S. A.* 52:35–8, *L.* 1959, *c.* 94.

On receipt of the statement under oath the state officials are required to classify such prospective bidders as to the character and amount of public work on which they shall be qualified to submit bids, and bids *"shall be accepted only"* from persons qualified in accordance with such classification. Notice of the classification must be sent to the prospective bidder within eight days after receipt of the statement. *N. J.*

*S. A.* 52:35–3. A person dissatisfied with his classification may obtain a hearing before the classifying official and present evidence in support of a different classification. *N. J. S. A.* 52:35–4.

A board of review of three persons is created to hear a prospective bidder who remains dissatisfied with the official's classification. The Secretary of State is designated secretary of this board, and the board is required to hear the complaint about the classification and certify its decision to the state official. *N. J. S. A.* 52:35–6. Notwithstanding the classification a state official has the right to reject a bidder at any time prior to actual award of a contract, where there have been developments subsequent to the qualification and classification, which in the opinion of the awarding official affects the responsibility of the bidder. But before taking final action on any such bid, the official concerned must notify the bidder and give him an opportunity to support the existing classification. *N. J. S. A.* 52:35–7.

Substantially the same statute in the same mandatory terms was adopted in 1962 with respect to local boards of education. *L.* 1962, *c.* 105; *N. J. S. A.* 18:11–9.1 *et seq.* The statement attached on introduction said:

"The purpose of this bill is to require the classification of persons proposing to bid on any public work for the local boards of education. The classification procedure would be handled by the State Board of Education in the same manner that State officials now manage the classification of bidders on public work for the State under chapter 52.35 of the Revised Statutes. This act would establish a central and comprehensive classification system which would be operated by the State Board of Education for the benefit of the local boards."

Under that statute the classification was to be made by the State Board of Education. *N. J. S. A.* 18:11–9.4.

In *Albert F. Ruehl Co. v. Board of Trustees of Schools for Industrial Ed.,* 85 *N. J. Super.* 4, 13 (*Law Div.* 1964), it was held that local boards of education were limited to accepting bids from bidders who had been qualified and classified by the State Board. Judge Labrecque declared also, and we

think soundly, that even though a prospective bidder had been qualified and classified in that fashion, the local board was justified in not treating that action as final, and in including in the instructions to bidders for plumbing work in school buildings, a requirement for submission of an up-to-date certified financial statement with the bid. Failure of the bidder to comply with the demand justified rejection of the bid.

The term "public work" in *N. J. S. A.* 52 :35–2 and in *N. J. S. A.* 18 :11–9.2 is not defined in either statute. It is defined in *Chapter* 33 of *Title* 52 which requires only domestic materials to be used "for any public work," as follows:

"Any public building, public highway, bridge, or other public better-ment, work or improvement of a permanent nature, constructed, reconstructed, repaired or improved wholly at the expense of the public." *N. J. S. A.* 52 :33–1.

When the question of application of *Chapter* 35 was raised at oral argument, the Deputy Attorney General expressed the view that "public work" in *Chapter* 35 was interpreted administratively as it is defined in *Chapter* 33, above. Since appellant raises no issue as to the pertinency or application of *Chapter* 35 to this controversy, we do not consider that the matter is before us and consequently no opinion is expressed thereon.

Under all the circumstances appellant has not shown the Director's action in rejecting its bid or in awarding the contract justifies judicial intervention. Accordingly the award is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.