145 N.J. Super. 187 (1976)
367 A.2d 432
IN THE MATTER OF HONEYWELL INFORMATION SYSTEMS, INC. PROTEST OF CONTRACT AWARD REQUISITION X-32.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 1976.
Decided October 13, 1976.
*192 Before Judges CARTON, KOLE and LARNER.
Mr. Garrett M. Heher argued the cause for appellant Honeywell Information Systems, Inc. (Messrs. Smith, Stratton, Wise & Heher, attorneys; Mr. George H. Henningsen on the brief).
*193 Mr. Thomas C. Jamieson, Jr. argued the cause for respondent International Business Machines Corporation (Messrs. Jamieson, McCardell, Moore, Peskin & Spicer, attorneys; Mr. Israel Spicer on the brief).
Mr. Peter D. Pizzuto, Deputy Attorney General, argued the cause for respondent Division of Purchase and Property (Mr. William F. Hyland, Attorney General, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by LARNER, J.A.D.
This is an appeal from the award of a contract for the furnishing and installation of a full data processing system for the State of New Jersey by the Director of the Division of Purchase and Property (Director) to International Business Machines Corporation (IBM). Appellant Honeywell Information Systems, Inc. (HIS), the unsuccessful bidder, attacks the award, claiming to be the lowest responsible bidder entitled to the contract under the "Request for Proposals" (RFP) which constituted the specifications and invitation for bids.
Because of rapid increases in the State's requirements of automatic data processing, the State Bureau of Data Processing recommended as early as August 1972 that the State procure sufficient additional equipment without competitive bidding to meet the existing needs until arrangements could be made for appropriate invitation for competitive bids. Accordingly, at that time, as well as on three other occasions between December 1972 and August 1973, the State leased certain data processing equipment from IBM without competitive bidding, pursuant to the statutory authority of N.J.S.A. 52:34-8 to 11.
Recognizing the growing need for the development of a complete data center equipped to handle the data processing of all departments of the State Government, a committee was formed in December 1973 composed of representatives from the Division of Budget and Accounting and the Division *194 of Data Processing (Evaluation Committee) to prepare an RFP in anticipation of competitive bidding. On June 28, 1974 the final draft of the RFP was circulated among 31 data processing firms. After a bidders' conference attended by representatives of six potential bidders where questions were asked and answered, only IBM and HIS finally submitted bid proposals on November 19, 1974.
The RFP was different from the usual invitation to bidders which is encountered in the judicial literature dealing with bidding practices of governmental entities. The State, in this instance, did not specify any finite items of equipment for which bids were solicited. The complex nature of the accouterments of the overall data processing, and its absorption into the state system, involving hardware, software, conversion costs, maintenance, personnel training, etc., defied the preparation of specifications which would identify particular types of equipment to be furnished by the bidder.
As a consequence, the lengthy RFP invited proposals for a total data processing system, outlining the State's performance requirements, and leaving to the discretion of the bidders the determination of the components of the system which would accomplish the desired goals.
IBM and HIS each submitted a proposal incorporating its own equipment which it represented would carry out the concept of a total data processing system designed to satisfy all the performance requirements of the State. Shortly after the submission of the two proposals, HIS on November 21, 1974 wrote to the Director of the Division of Purchase and Property expressing concern with the method by which IBM computed its bid. The essence of its objection at that time, as well as the nub of its contention on this appeal, is that IBM improperly deducted from its bid figure purchase option credits of $938,693 in connection with the lease of equipment already in use by the State. It asserted that the bids should be evaluated without consideration of these credits and that HIS would be the lower bidder on the basis of the gross purchase price in both proposals.
*195 This protest by HIS evoked expressions of opinion on the subject from those officials intimately involved in the acquisition process. On November 26, 1974 Edward G. Hofgesang, Deputy Director of the Division of Budget and Accounting, wrote a memorandum to the Director of the Division of Purchase and Property as follows:
I wish to record my strong opposition to the suggestion, communicated to you by Honeywell Information Systems, Inc., that purchase option credits earned by the State of New Jersey be disallowed in the evaluation of the proposals received through bid RX-32.
It is clear that this money has properly accrued to the State's benefit and should the decision be reached to purchase either of the proposed systems the amount of any such credits should certainly be used in determining the award. To do otherwise would be an injustice to the taxpayers of the State.
On February 5, 1975 Harry J. Collis, Supervisor of the Bureau of Data Processing, wrote to Hofgesang, noting that the Evaluation Committee had taken the position that accrued option credits should be allowed in evaluation of the bids. This letter pointed out that, without consideration of conversion costs and other favorable cost items, the use of these credits would result in a saving to the State under the IBM bid of approximately $717,000, whereas the elimination of the credits would render HIS the nominally low bidder by $383,000. In addition, he urged that the acceptance of the IBM bid would produce benefits, monetary and otherwise, to the State which would be lacking with the HIS proposal.
Upon submission of the proposals there was conducted a "bench mark" test wherein each company for a period of three days had the opportunity to demonstrate to the State's Evaluation Committee its proposed system and the nature of its performance. In addition to this "bench mark" test the Evaluation Committee made a thorough study and analysis of the two proposals with respect to quality of performance and price. On February 19, 1975 it submitted to the Deputy Director of the Division of Budget and Accounting a *196 comprehensive report which unanimously concluded that the IBM proposal was lowest in cost and most responsive to the State's needs and recommended that the contract be awarded to IBM.
The comprehensive report includes a performance evaluation based on percentage points allocated to the various sections of the performance requirements. Utilizing 100% as the ideal, the committee concluded that IBM scored 98.54% and HIS 76%, and that IBM surpassed HIS in each category. Further analysis was submitted by way of a detailed breakdown of the committee's findings which resulted in the respective point allocations. Interlaced through the highly technical evaluation report are expressions such as "IBM's equipment offers a clear performance advantage and IBM is the lowest responsible bidder," "IBM's conversion plan can be implemented with no disruption of critical operations, no reprogramming and little additional training."
In addition to the evaluation of the performance standards of both proposals, the committee analyzed and evaluated the various cost proposals of both bids, which included cost of hardware, software, maintenance, conversion costs, interest, freight, training, parallel operation and collateral costs to the State under each proposal. It found, after all adjustments, that the total cost to the State, based on a five-year monthly installment plan under the HIS proposal, was $8,738,140 while the cost under the IBM proposal was $7,966,782.
On February 20, 1975, Hofgesang wrote to the State Treasurer, submitting a copy of the report and recommendation of the Evaluation Committee, adding his own recommendation that IBM receive the contract award.
On March 11, 1975 L.E. Weber, Director of the Division of Data Processing and Telecommunications, delivered a memorandum to the Director of the Division of Purchase and Property whereby he submitted a copy of the analysis and report made by a committee in his Division entitled "Treasury Data Processing Committee." He stated: "It *197 can be concluded that both vendors proposal systems that effectively meet the required specifications, and that the IBM proposal is measurably superior." As a result of the detailed cost evaluation by this additional committee, Weber concluded that the IBM bid was lower with purchase option credits allowed and stated: "I concur with the recommendation of the Acting Director, Division of Budget and Accounting, that the award for this contract be made to IBM Corporation. This is certainly the best business decision."
Upon submission of Weber's memorandum, his committee, on May 8, 1975, questioned his memorandum statement to the effect that "both vendors proposed systems that effectively meet the required specifications." The committee's observation on that score reads, "We can find no documentation which supports this conclusion." The Committee further noted that while the award to IBM is a sound business decision, there exists a legal question whether the purchase option credits can be utilized in evaluating the bids.
On May 9, 1975 Giulio Mazzone, Supervisor of the Purchase Bureau, wrote to his superior, Frank M. Papale, Jr., Director of the Division of Purchase and Property, submitting all the reports and memoranda referred to, noting the evaluations by the Evaluation Committee, the Division of Data Processing and the staff of the Purchase Bureau. Although this communication expressed the opinion of Mazzone that the credit options should not be considered in the evaluation of the proposals, it recommended the award to be made to IBM in view of the advice of counsel on the subject of the credit options.
A notation of the approval of the award to IBM is found on the Mazzone report. Upon notification to HIS that the contract was to be awarded to IBM, HIS responded by protesting the action and requesting a hearing. An informal hearing was thereupon held by the Director in the presence of the several state employees concerned with the project on May 29, 1975, at which time HIS representatives and counsel presented *198 their position as to the alleged impropriety of the award to IBM.
A full review and evaluation was again made by Papale subsequent to this hearing, and in a communication of July 2, 1975 to HIS he advised that the decision to award the contract to IBM would stand. On the question of the purchase option credits he stated:
The acceptance of purchase option credits or any price offering that represents a price advantage to the State of New Jersey, must be considered a sound business judgment and in the best interest of the State and its taxpayers.
The contract with IBM was executed on or about July 29, 1975. An application for a stay of performance of the contract was denied by the Appellate Division upon the submission of briefs by both litigants, including a representation by IBM that if the contract is rescinded on appeal it would accept quantum meruit compensation by way of rental payments for its performance to the date of rescission.
The thrust of appellant's position is twofold: (1) the purchase option credits cannot be considered in evaluating the cost under the IBM proposal because it gives IBM a competitive advantage not enjoyed by HIS or any other potential bidder, thereby frustrating full and free competition, and (2) the absence of any reference in the RFP to the purchase option credits as an item for consideration in the bid evaluations disqualifies the IBM bid as a departure from the specifications.
A discussion of the issues involved in this appeal must originate with the statutory provisions governing purchases and contracts requiring the expenditure of state funds. With respect to purchases exceeding $2500, the statute mandates public advertisement for bids. N.J.S.A. 52:34-6. Provision is made for waiver of public advertising with respect to certain purchases and services when approved in writing by the State Treasurer. N.J.S.A. 52:34-8-11.
*199 N.J.S.A. 52:34-12 contains the criteria governing the award of a contract pursuant to public advertising and bids. Subsection (d) provides that the award
shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered. Any or all bids may be rejected when the State Treasurer or the Director of the Division of Purchase and Property determines that it is in the public interest so to do.
It is readily discernible that the statutory standard for the award of contracts by the State differs significantly from that applicable to the subordinate governmental entities of counties and municipalities. The latter are governed by a more strict and rigid standard mandating that the award be made to "the lowest responsible bidder." See N.J.S.A. 40A:11-6.1.
In Commercial Clean, Corp. v. Sullivan, 47 N.J. 539 (1966), the Supreme Court considered the State purchasing statute and clearly highlighted the legislative policy inherent in N.J.S.A. 52:34-12(d) to grant to the Director of the Division of Purchase and Property broad discretion in awarding a contract to a bidder which "will be most advantageous to the State, price and other factors considered." He is not bound by a mandatory requirement that the contract be awarded to the lowest responsible bidder, and as a corollary thereof, such a lowest responsible bidder does not have an absolute legal right to the contract award.
Justice Francis, speaking for the Court in Commercial Clean. Corp., summarized the effect of N.J.S.A. 52:34-12(d):
* * * We are satisfied from the antecedent history and the language of the 1954 act that the Legislature established much more flexible standards as a guide for the Director's decision to award a public contract to a particular bidder whether or not he is the low bidder. This is not to say the low bid may be ignored or treated as a minor consideration. It is a factor of great importance and not to be lightly discarded. But we are satisfied that at this particular level *200 of State activity, the legislative plan for awarding public contracts, which, as here, requires public advertising for bids, was to extend greater freedom of action to the Director and Treasurer than the circumscribed rule imposed on counties and municipalities. * * * [at 548-549.]
In essence, the Director is given great flexibility in awarding a contract to the bidder whose proposal will be most advantageous to the State, taking into consideration all factors. In making his decision the Director necessarily is required to exercise the sound business judgment of an executive based on all available data, expertise and advice which he may be able to garner from all available sources See Motorola Com. & Electronics v. O'Connor, 115 N.J. Super. 317, 321 (App. Div. 1971).
In view of the discretionary power vested in the Director by the Legislature, the scope of judicial review in an action by an unsuccessful bidder is rather limited. Commercial Clean. Corp. sets forth the guidelines of such review.
* * * It follows also that the lawmakers' purpose was to draw in the boundaries delineating the area of judicial intervention when an attack is made on the Director's award of a contract. These considerations lead us to conclude that the courts should not and cannot substitute their discretion for that of the Director or Treasurer. In our view the judicial standard for appraising the propriety of the exercise of his discretion in awarding a contract or in rejecting a bid or a bidder should be that the courts will not interfere in the absence of bad faith, corruption, fraud or gross abuse of discretion. * * * [47 N.J. at 549]
See also, Newark v. N.J. Turnpike Authority, 7 N.J. 377, 381-382, app. dism. for want of a substantial federal question, 342 U.S. 874, 72 S.Ct. 168, 96 L.Ed. 657 (1951).
The statutory goal guiding the Director's decision is to select the responsible bidder whose bid will be most advantageous to the State. This is an affirmation of the judicial pronouncements in this State that bidding statutes are intended to secure competition and "guard against favoritism, improvidence, extravagance and corruption," in order to benefit the taxpayers and not the bidders. See Trap *201 Rock Industries, Inc. v. Kohl, 59 N.J. 471, 481-482 (1971), cert. den. 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); Hillside Tp. v. Sternin, 25 N.J. 317, 322 (1957); Weinacht v Bergen Cty. Bd. of Chosen Freeholders, 3 N.J. 330, 333 (1949). The public's interest is paramount. This is not to say that a responsible bidder whose proposal is most advantageous to the State can be shunted aside for a favored bidder by arbitrary action, bad faith, fraud or corruption. As pinpointed in Commercial Clean. Corp., supra, such governmental impropriety is always subject to review and correction by judicial intervention.
In this instance there is no charge of bad faith, fraud or corruption, nor are there facts to support such a charge.[1] Plaintiff's challenge is centered rather upon the contention that IBM gained an unfair advantage through its prior noncompetitive rental contract which, in turn, opened the door to its ability to offer substantial credits in reduction of the price contained in the proposal under attack. HIS urges that fair competitive bidding on a common basis dictates that the Director should not have computed the purchase option credits in evaluating the cost of the IBM bid. It argues that such a practice creates a potential for favoritism contrary to the basic tenants of the law relating to full and free competition, citing such cases as Hillside Tp. v. Sternin, supra, 25 N.J. at 322; Fereday & Meyer Co., Inc. v. Elizabeth Bd. of Pub. Works, 27 N.J. 218, 223 (1958); Waszen v. Atlantic City, 1 N.J. 272, 283 (1949).
Our function is to determine under all the circumstances involved in the invitation for bids and proposals for this highly sophisticated data processing system whether the decision of the Director was so arbitrary as to constitute a "gross abuse of discretion."
*202 The documentation in the record before us, as demonstrated in the synopsis of the facts contained in this opinion, makes it clear that the final decision was bottomed upon an extremely thorough study and evaluation of both proposals over a period of six months by state officials having the requisite expertise to appraise the relative merits of the bids in this technical area. In addition, HIS, as the disappointed bidder, was afforded an informal hearing in accordance with the procedure recommended by the Supreme Court in Commercial Clean. Corp. v. Sullivan, supra, 47 N.J. at 550.
The original decision to lease equipment from IBM without advertising was made pursuant to the legislative sanction contained in N.J.S.A. 52:34-8 to 11. It served the purpose of acquiring a limited number of data processing machines for the smooth operation of State Government until plans could be made for the overhaul of the system into a complete data center equipped to handle all the needs of the State.
When IBM submitted its proposal for the complete data system it prepared a total concept of computer hardware and software plus other accompanying services which would satisfy the performance requirements of the State. It proposed the inclusion of leased machines as a part of the configuration of equipment required for the total project. These machines were considered as viable components in the comprehensive plan which IBM presented to accomplish the State's goal.
As a result of this plan IBM was in a position to offer the credits available under the lease agreement in reduction of its gross price as a substantial saving to the State. For the Director to have disregarded these credits in evaluating the price differential between the IBM and HIS proposals would have required a blatant abandonment of the business judgment which he must apply in order to achieve the legislative directive to make the award which is most advantageous to the State. Realistically, the Director *203 selected the wisest course which produced a substantial dollar saving to the State and its taxpayers. Obviously, if the IBM equipment were not purchased in the overall scheme, the State would have lost the benefit of these credits amounting to approximately $900,000.
In fact, his decision was based not only upon the factor involving the purchase option credits. It was also based upon an analysis of other features of the bids, wherein the performance demonstration of the IBM set-up was superior in many respects and the costs pertaining to conversion, training, interest payments, etc., were far less under the IBM proposal than under the HIS proposal.[2]
We do not consider that the concept of fair and full competitive bidding has been subverted by the mere fact that IBM was able to offer a credit or discount to reduce its price whereas HIS was unable to do so. In the context of the applicable statute which does not mandate an award to the lowest bidder and permits consideration of "other factors" the Director was justified in considering the deduction for the purchase option credits. There is no legal bar to an evaluation which takes such credits into account.[3]
On closer analysis, the allowance for the purchase option credits is no more than a type of discount allowed by *204 IBM as part of the price structure. The ability of IBM to offer such a discount was simply a circumstance brought about by the negotiated purchases which were legally accomplished pursuant to legislative authorization. Nothing in the specifications is pointed to as a tailoring technique whereby IBM alone could qualify as a bidder. The business circumstance which permitted IBM to offer such a discount is immaterial in the Director's judgmental decision to seek the bid which most benefited the State. The State, as vendee, is and should be interested in the bottom line figure. And if the cost to the State is less under a bid from a contractor who fully qualifies, the Director should take advantage of the discount offer regardless of the plea of a competitor that it cannot afford to do the same.
We next turn to the additional contention of HIS that the consideration of purchase option credits was improper because of failure to refer to the same in the RFP, and that such omission renders the IBM bid fatally defective.
To begin with, HIS undoubtedly knew from the description of "Current Hardware" in the RFP that the State was currently using leased IBM equipment in the existing data center, and the specifics as to model numbers and dates of acquisition. With this information a company expert in the field could reasonably anticipate that IBM might propose the continued use of this leased equipment in its submission. If this is a reasonable assumption, HIS and other bidders were not in the dark as to the possibility that IBM would offer to allow purchase option credits toward its bid, since such purchase option credits are common in equipment leases in the industry.
However, even discounting the foregoing factual background which alerted HIS to the potential position of IBM, the absence of specific reference to purchase option credits in the RFP did not serve to destroy a common bidding standard for all suppliers. The specification of the State's needs applied equally to both bidders. Each offered its own equipment and its own design to accomplish the specified *205 performance. Each was free to submit any type of price proposal  based on a flat price or a gross price minus a discount. The specification did not inhibit either bidder from utilizing its own pricing technique. The mere fact that IBM saw fit to give the State the advantage of the purchase option credit in its price computation did not render that bid invalid. In the absence of a specification in the RFP which is inconsistent with the pricing method of IBM, there can be no claim that IBM's bid differs materially from the specifications.
We agree that it would have been preferable practice under the existing circumstances to have made some reference in the RFP to the possibility that purchase option credits would be considered in evaluating the proposals. See Donald S. Hubsch Co., Inc. v. Sullivan, 47 N.J. 556, 559 (1966). However, the failure to do so is not fatal.
Our careful review of the documentation contained in the appellate record convinces us that the award of the contract to IBM represents a decision on all phases of the proposals well within the discretionary power of the Director of the Division of Purchase and Property. His finding that IBM was a responsible bidder whose proposal conformed to the specifications and was most advantageous to the State is amply supported by the underlying facts, studies and analyses under his control. It is most appropriate in the unfamiliar and complex area involved in this case that we give great deference to the expertise of the Director and his supporting personnel. Judicial intervention is not warranted.
Affirmed.
NOTES
[1] In its brief HIS makes an oblique attack which implies some plan to install IBM as the supplier under the lease in order to freeze out other bidders. Since there is no factual support for this allegation, we do not deem it of value to discuss it further.
[2] The RFP notified bidders:

The evaluation of vendor proposals will be primarily concerned with, but not limited to, the following:
Hardware capability, reliability, modularity and expandability. Software capability and degree of compatibility with existing applications.
Overall costs, including conversion costs, cost of hardware, cost of training, cost of maintaining hardware and software, and other costs resulting from the installation of the new systems.
[3] We note that the regulation adopted pursuant to the Federal procurement statute (41 U.S.C. § 253 (1965)) which served as a model for the New Jersey Act (Commercial Clean. Corp. v. Sullivan, supra, 47 N.J. at 548), provides that purchase option credits when applicable are to be considered in the evaluation. See 41 C.F.R. § 101-32.408-3.