169 N.J. Super. 1 (1979)
403 A.2d 970
BLONDELL VENDING, PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 22, 1979.
Decided June 12, 1979.
*3 Before Judges LYNCH, CRANE and HORN.
Mr. Adrian M. Foley, Jr., argued the cause for appellant (Messrs. Connell, Foley & Geiser, attorneys; Mr. Thomas S. Cosma on the brief).
Mr. Joseph L. Yannotti, Deputy Attorney General, argued the cause for respondent (Mr. John J. Degnan, Attorney General, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. Philip J. Perskie argued the cause for J.L.P. Vending Co., Inc., in opposition to appellant's appeal (Messrs. Cooper, Perskie, Katzman, April, Niedelman & Wagenheim, attorneys; Ms. Mary Maudsley Reiss on the brief).
The opinion of the court was delivered by HORN, J.A.D.
Appellant Blondell Vending appeals from the final decision of the Special Assistant in Charge, Division *4 of Purchase and Property, of the Department of the Treasury, State of New Jersey, dated December 6, 1978, disallowing appellant's request for a hearing concerning the contract award for Bid X-356 and reaffirming said Special Assistant's decision dated November 24, 1978 awarding contracts to others than appellant in the zones for which appellant had submitted bids.[1]
In June 1978 the Division of Purchase and Property solicited bids upon contracts for vending-machine services at facilities owned or maintained by the State. The bid specifications divided New Jersey into 11 geographical zones, and a bidder could bid for contracts in as few or as many zones as it pleased. The contracts awarded to the successful bidders the exclusive right to install and operate vending machines at designated locations in each geographic zone. In exchange, the State receives a percentage of net sales of the various products sold through the vending machines.
The Request for Bid Proposal (RFP) specified that the vendor must bid on all locations in the zone and on the full product line. The RFP required the vendors to make a tour "for the purpose of inspecting the service specified in the proposals to acquaint them with the services to be performed." More specifically, another portion of the RFP required that:
Contractor shall survey all locations to determine the number of machines actually needed to take care of requirements and shall obtain approval for the installation of such machines from the Director of the Division of Purchase and Property.
It also required that the vending machines be equipped with a coin-changing device. If the machines were not so equipped, the vendor was required to provide separate change-makers when necessary.
*5 On July 17, 1978 the Division gave telephone notification of the following awards:

 Vendor Zones Awarded
 Servewell Vending 1, 2, 3 and 4
 Canteen Corp of Nutley 5
 Carnival Vending 6
 Canteen Corp. of Phila. 7 and 9
 Campus Vending 8
 J.L.P. Vending 10 and 11.

That same day the Division received a letter (dated July 14, 1978) from counsel for appellant pointing out alleged deficiencies in the bid specifications. The letter claimed that more machines were required for Zones 2 through 5 than were listed, and that the listing of equipment in the RFP did not include necessary condiment stands, cooking ovens and dollar-bill changers.
An internal investigation by the Purchase Bureau of the Division was prompted by the above letter. That investigation revealed that an outdated inventory list had been used in the preparation of the RFP. On July 18, 1979 the Acting Director decided to rescind all contract awards and to reject all the bids. Contracts with incumbent vendors were extended for an additional year.
Three of the successful bidders, Canteen Corp of Nutley, Canteen Corp of Philadelphia and Servewell Vending, protested the rejection of the awards and were granted a hearing on August 8, 1978. All bidders were invited to attend, but the parties were forewarned that the hearing would be limited to the decision of the Acting Director to rebid due to specification errors.
Three officers of Canteen Corp(s). and Servewell testified that they made on-site inspections of vending-machine locals. The president of Servewell said there were some slight discrepancies in the numbers of machines on site, but he emphasized that the specifications required the contractor to put in all equipment necessary to service the locations. Said testimony made clear that the discrepancies in the specifications *6 were largely attributable to the noninclusion of collateral equipment such as change machines, ovens and condiment stands.
The district manager of Canteen Corp(s). said he envisioned the installation of 74 machines to service Zone 5, even though only 59 machines were listed in the bidding specifications. A witness for the incumbent bidder in Zones 10 and 11, J.L.P. Vending, testified that its bid was not based on an on-site inspection, but rather from its knowledge of the number of vending machines required in the zones it served.
In a report to the Acting Director dated August 14, 1978, the hearing officer recommended that the original awards be reinstated. The hearing officer said that the specification errors in the RFP were insignificant. He noted that the State reserved the right to add or remove machines in a particular locale. The failure to list ovens, condiment stands and change machines did not provide an advantage to any bidder, since a required on-site inspection made it clear that such machines were necessary.
By decision dated September 15, 1978 the Acting Director decided to accept the findings of the hearing officer on the specification discrepancies in the RFP. He said:
* * * I am not convinced by the argument that the inadequacies in the specifications regarding numbers of machines invalidated the bid. An incumbent was in no better nor worse position than any other vendor simply because he was an incumbent. Blondell, for example, admittedly chose to bid, not on the exact listing contained in the specifications, but on what it knew in fact to be agency requirements. Testimony at the hearing indicates that all other vendors bid on the same basis, with the only exception being that they had to visit the sites to determine the correct numbers.
However, the Acting Director felt the contracts must still to rebid. Responding to an issue raised by Carnival Vending and Blondell Vending, the Acting Director said that the pricing structure of the bid specifications did not establish a common standard upon which the bids could be evaluated. *7 The bids did contain approximate net sales figures per-year by item at the various zones. However, the bidders were given discretion in setting the commission percentage and also the selling price per product. The Acting Director concluded:
The only means by which I can be assured that the winning proposal brings the most revenues to the State under all circumstances would be to have all vendors use the same unit price and bid a common commission rate for all commodities in the zone. Whether or not such a system would be appropriate or practical, however, should be decided in consultation with all vendors prior to formalizing specifications for an immediate rebid.
On October 12, 1978 a hearing was held on the pricing structure of the bids. An official of the Purchase Bureau testified that, although the individual selling prices of products were reviewed to determine whether they were exorbitant or unreasonable, no bid was rejected on that basis.
An officer of Canteen Corp(s). testified that the price fixed for various items by the vending companies was intimately related to the market price of the product:
* * * [I]f it [the price of the product] is too high, you are not going to sell anything; if it is too low, you don't make any profit. So it is going to be what it is usually going for in that particular area where you are vending.
A principal of Carnival Vending testified that in his experience as a bidder on vending-machine contracts the State had always specified the price of each product by product-line or by machine type. He said that the after-tax profit margin of the industry was 4-5% and that a one-nickel difference on the selling price of an item can enable the bidder to offer a "substantially higher" commission to the State.
The president of J.L.P. Vending said that in order to put all bidders on exactly the same footing the State would have to specify the variety, quality, weight, size and *8 quantity of each item listed, down to the net meat weight and type of bread and quality of bread "and a million other things" involved in the preparation of a sandwich.
Also discussed at the second hearing was a contention that Canteen Corp(s). had deviated from the specifications because it submitted its bids subject to an unauthorized cancellation clause. However, the hearing officer concluded that the letters to the State from Canteen were a request to clear up an alleged ambiguity in the specifications, and that that request did not invalidate Canteen's bids.
With regard to the pricing issue, the hearing officer found that by failing to establish the selling prices for each product the specifications do not provide a common standard for competitive bidding. The hearing officer was not convinced, however, that all of the contracts must be rebid. He said the bids should be re-evaluated. "In those zones where the successful bidder proposed to sell the products at a price equal or lower than the other vendors, I recommend the awards be affirmed."
By said decision dated November 24, 1978 the Acting Director acted on the hearing officer's recommendations and decided to reinstate all awards except those for Zones 7 and 9. Only in Zones 7 and 9 was there a difference in unit prices which could disadvantage the unsuccessful bidders. The Acting Director wrote:
It should be noted that in the two zones to be rebid, the differentials between the high discount bidder and the next lowest bidder were the smallest of any of the zones. In zone 9, the difference between bids was only $760. In zone 7, the difference was approximately $3,500 of a total bid of nearly $60,000. It is in these two zones that the possibility of unit price fluctuations could have the most impact. Only the slightest changes in the pricing structure could change the relative position of the vendors.
In a mailgram dated December 5, 1978 counsel for appellant protested the final decision of the Acting Director and requested a hearing, contending that the hearing requested by it previously in its counsel's letter of July 14, 1978 had *9 never been granted. The Acting Director rejected this request and reaffirmed his decision by letter dated December 6, 1978. This appeal followed. We denied an application for a stay of the contract awards, but directed that the cause be accelerated.
Preliminarily, and although neither the State nor any of the other parties to the appeal raises the issue of appellant's standing before us to challenge the specifications on which the contracts were awarded, we note that there is a serious question as to whether appellant enjoys a status which enables it legally to question the awards.[2] The doubt as to appellant's right to challenge the specifications is raised because it was itself an unsuccessful bidder. See Waszen v. Atlantic City, 1 N.J. 272, 276 (1949); Camden Plaza Parking v. Camden, 16 N.J. 150, 158 (1954); Pucillo v. New Milford, 73 N.J. 349, 354 n. 4 (1977); Armaniaco v. Creskill, 62 N.J. Super. 476, 480 (App. Div. 1960); James Petrozello Co., Inc. v. Chatham Tp., 75 N.J. Super. 173, 179 (App. Div. 1962).
Although appellant did send a letter (dated July 14, 1978) protesting certain alleged inaccuracies in the bidding specifications, that letter was not received until after the Division had awarded the bids on July 17, 1978. Thus, it could be argued, appellant was trying to have it both ways  if it were a successful bidder it could drop its objections to the specifications; if it were not successful it could press forward its objections. This was precisely the type of situation the Waszen, supra, standing rule is supposed to prevent.
Nonetheless, since the issue has not been fully briefed and was argued only superficially, we have determined to assume  in the interest of justice and our policy to take a liberal view on the issue of standing, Crescent Park Tenants *10 Ass'n v. Realty Eq. Corp. of N.Y., 58 N.J. 98, 107-108 (1971); In re Quinlan, 70 N.J. 10, 34-35 (1976); Urban League of Essex Cty. v. Mahwah Tp., 147 N.J. Super. 28, 33 (App. Div. 1977), certif. den. 74 N.J. 278 (1977); Walker v. Stanhope, 23 N.J. 657 (1957)  that appellant does have the requisite standing in the case. However, as noted hereinafter, the fact that it submitted a bid without advance protest militates against the validity of its claim.

I
The primary basis of appellant's attack upon the legality of the bid specifications is that the pricing structure placed bidders on an unequal footing. It relies heavily upon the Acting Director's initial ruling that the pricing structure of the bid specifications did not establish a common standard upon which the bids could be evaluated. The alleged deficiency in this pricing structure was the failure to fix selling prices of the commodities to be vended so that the bid of commissions would be upon a common level. The fact that the bidders could fix their own selling prices, it is claimed, destroyed equality of competition. We disagree with appellant's argument, in the light of the realities of the situation and the governing law.
The bidding statute directs the director to award a contract
* * * to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered. Any or all bids may be rejected when the State Treasurer or the Director of the Division of Purchase and Property determines that it is in the public interest so to do. [N.J.S.A. 52:34-12(d); emphasis supplied]
The Supreme Court has said that the Legislature thus necessarily limited the scope of judicial review when a decision of the Director is challenged on appeal, thus:

*11 * * * In our view the judicial standard for appraising the propriety of the exercise of his discretion in awarding a contract or in rejecting a bid or a bidder should be that the court will not interfere in the absence of bad faith, corruption, fraud or gross abuse of discretion. [Commercial Clean. Corp. v. Sullivan, 47 N.J. 539, 549 (1966)]
See also, Motorola Com. & Electronics, Inc. v. O'Connor, 115 N.J. Super. 317 (App. Div. 1971), and In re Honeywell Information Systems, Inc., 145 N.J. Super. 187 (App. Div. 1976), certif. den. 73 N.J. 53 (1977).
Under N.J.S.A. 52:34-12(d) the Director of the Division of Purchase and Property does not have to award a contract to the lowest responsible bidder. Commercial Clean. Corp., supra 44 N.J. at 548. The Director is afforded great discretion in choosing a bidder by that statutory section, and
* * * is given great flexibility in awarding a contract to the bidder whose proposal will be most advantageous to the State, taking into considerations all factors. In making his decision the Director necessarily is required to exercise the sound business judgment of an executive based on all available data, expertise and advice which he may be able to garner from all available sources. [In re Honeywell, supra, 145 N.J. Super. at 200]
Appellant stresses that N.J.S.A. 52:18A-19 mandates the Director to award contracts to the lowest responsible bidders and that N.J.S.A. 52:34-12(a) requires that specifications and invitations for bids "shall permit such full and free competition as is consistent with the procurement of supplies and services necessary to meet the requirements of the using agency." A reading of the entire statute leaves us with the impression that read in pari materia, N.J.S.A. 52:34-12(a) and N.J.S.A. 52:18A-19 are not irreconcilable with N.J.S.A. 52:34-12(d). The provisions to make the award to the lowest responsible bidder and to permit full and free competition are subject to the exigencies of various cases. Here, the very nature of the vended items and the types of contracts require the exercise of the discretion *12 committed to the Division by N.J.S.A. 52:34-12(d). We do not agree with appellant's argument that our courts have simply overlooked the terms of N.J.S.A. 52:18A-19 in the past. See In re Honeywell Information Systems, Inc., supra 145 N.J. Super. at 199.
We recognize that the Acting Director felt at one point that the vending machine contracts would have to be rebid, with unit prices supplied. He was eventually convinced, however, by the hearing examiner's recommendation, that the bids be re-evaluated. In those zones where the successful bidder proposed to sell the products at a price equal to or lower than the other vendors, the hearing examiner recommended that the awards be affirmed. Finally, the Acting Director decided to rebid the contracts only in Zones 7 and 9, the zones where different unit prices could have worked to the disadvantage of the unsuccessful bidders.
The methodology chosen by the Director to review the submitted bids to determine if the pricing structure affected the result seems fair. In Zones 1 through 4, for example, the winning bidder, Servewell Vending, in all instances bid unit prices lower than or equal to the unit prices of its competitors. J.L.P. Vending Co., Inc's prices in Zone 11 were also markedly lower than those of its competitors. In Zone 6 Carnival Vending made the only bid. In Zones 5, 8 and 10 the director gave the unsuccessful vendors the "full benefit of the difference between the lower unit cost figure and the high unit cost figure submitted by the winning vendor and assume[d] that the lower vendors could potentially reimburse the entire amount to the State." The Director thus gave the losing bidder the benefit of assuming that, if it had submitted the higher unit price of the winning bidder, all excess receipts would have been returned to the State. Even so, in those zones the bidding results would not have changed. Only in Zones 7 and 9 could the pricing structure of the items bid have affected the result of the bidding, and in those zones the director decided to require rebidding.
*13 In addition to the fact that the Director's review of the bidding process seems eminently fair, there is also the practical consideration that providing bidders with standardized unit prices would not necessarily have been fairer than omitting those prices altogether. For instance, to be completely, fair, the state specifications would have had to specify in the candy category, for example: the kind of candy (e.g., chocolate bar), the name brand (e.g., Hershey's), the weight (e.g., 2 ounces) and the selling price (e.g., 25 cents). For a sandwich the State would have had to specify the quality of meat, the weight of the meat, the kind of bread to be used, etc. The bidding process actually chosen by the Division (fixed net sales with commission percentages and unit selling prices to be supplied by the bidder) does not seem intrinsically unfair. The methodology chosen by the Director for the reexamination of the bids removed any unfairness that the absence of unit pricing may have caused.
The cases appellant cites for the proposition that it was prejudiced by the bidding structure chosen by the Division are factually distinguishable. For example, in James Petrozello Co., Inc. v. Chatham Tp., supra, the township sought bids for garbage collection contracts. Bidders were required to make a lump-sum bid for the collection and disposal of the garbage from all structures in existence upon the commencement of the term of the contract, and also for a unit-bid per-month charge for each of several categories of structures erected in the future during the term of the contract. 75 N.J. Super. at 175. One bidder had a lower lump-sum price, while a competing bidder had a lower unit price. Id. at 180. The court found that the municipality could forecast its future growth in a manner that would entitle either bidder to the contract. Id. The lack of a predetermined standard for town growth gave the township the power to favor one bidder over another. Id. at 181. In the instant case the Division acquired no such arbitrary power by leaving the unit-price figures open. The common standard for the award of bids was the commission given to the State. Appellant saw *14 fit to submit its bids without protest. Thus it may be assumed that it did not see any unfairness in the bid specifications. It could have challenged the bid specifications before any bids were opened. Although it claims that it had done so by oral communication with the Acting Director, that fact is not admitted by the State and is not a part of the record. But even so, when unsuccessful in its efforts, it could also have sought a judicial determination of the issue in advance. Appellant makes no claim that the awards were tainted by fraud or any corrupt influence. We are satisfied that there was no gross abuse of discretion and that the challenged contracts were validly awarded. Commercial Clean. Corp. v. Sullivan, supra.

II
Appellant also contends that the error in the specifications as to the number of machines at each location produced an unequal footing among the bidders which was fatal to the scheme of the competitive bidding statute. After a hearing on this point, the hearing examiner determined that the errors caused by using a year-old inventory list to compile the bidding specifications did not warrant a rebidding of the contracts:
Since, the errors in the RFP were insignificant, it was inappropriate to cancel all awards. The rejection of all bids without a proper basis is inconsistent with our policy of competitive bidding and can result in discouraging vendors from bidding.
As the State points out, there was no testimony regarding errors in the specifications for Zones 1, 6 or 8. The testimony on Zones 3, 10 and 11 indicated that the specifications had correctly enumerated the vending machines in place and on site. The errors in Zones 2, 4, 5, 7 and 9 were relatively minor. The RFP failed to list two vending machines out of *15 30 in Zone 2; one out of 43 in Zone 4; six out of 65 in Zone 5; one out of 173 in Zone 7 and two out of 59 in Zone 9.
In addition, the specifications stated that the State could require changes in the numbers of machines throughout the contract period. The specifications contained a clause which said that the contractor would agree to add, remove or change machines in locations "as the business increases or decreases." Also, bidders were expected to make on-site inspections "for the purpose of inspecting the service specified in the proposal to acquaint them with the services to be performed." The bidders were expected to survey the sites to determine how many and what kinds of machines were "actually needed" to satisfy the bidding specifications. Testimony of the vendors at the hearing indicated that such on-site inspections were actually made and that the figures supplied in the bids were based on the companies' calculations of machines actually needed.
The relatively minor errors concerning the number of machines in the bidding specifications do not require a rebidding of the contracts. The Acting Director's decision in this regard will not be overturned.

III
We now take up appellant's contention that it was improperly denied a hearing by the State. N.J.A.C. 17:12-3.1 provides a mechanism by which a disappointed bidder may request a hearing from the Director of the Division of Purchase and Property. However, the Acting Director in the case at bar did have hearings on the two main issues advanced by appellant (i.e., the absence of a uniform unit-price structure and discrepancies in the numbers of vending machines actually required).
Although the hearings provided by the Acting Director were limited in scope (to the pricing and machine-number issues, respectively), other issues raised by appellant did *16 not warrant a full hearing. Canteen Corp(s). put in their own figures for approximate net-sales figures, but as appellant conceded, the State disregarded those figures and multiplied the supplied sales figures against the commission percentage listed by Canteen. Also, Canteen Corp(s). submitted a disclosure statement in compliance with the RFP and N.J.S.A. 52:25-24.1 in conjunction with the bid of the Philadephia Branch for Zones 7 and 9. The same form was not supplied with the bid for the Nutley Branch, but that appears to have been a minor variation and not sufficient to require a rebidding.
In sum, the major faults appellant finds with the bid request have been the subjects of administrative hearings and determinations, are supported by credible evidence and sound reasoning. We affirm same. We are satisfied that other minor points advanced by appellant as to hearing deficiencies are insubstantial.

IV.
Finally, appellant complains that Canteen Corp. of Nutley violated bidding specifications when it submitted a letter which stated:
It is the understanding of Canteen Corporation that the vendor may not cancel this contract without the express permission of the Director of Purchasing upon ninety (90) days written notice.
Canteen Corp. of Philadelphia also sent a letter to the Division which said:
Our proposal is for a 3 year or 5 year contract, per specifications, in which either party, after 1 year, may terminate contract by giving the other party 90 day written notice.
A principal of Canteen Corp(s). testified that these letters were prompted by ambiguous termination provisions in the RFP. Those provisions state:

*17 The State reserves the right to terminate any contract entered into as a result of this bid provided written notice has been given by the Director of Purchase and Property to the contractor at least 30 days prior to such proposed termination date.
* * * * * * * *
* * * In the event the services are terminated either by contract or by voluntary termination by either the State of New Jersey or the Contractor, it shall be incumbent upon the Contractor to continue the service until new service can be completely operational. At no time shall this service extend 90 days beyond the expiration date of the existing contract.
A representative of Canteen Corp(s). testified that in writing the letters to the Division "[w]e were merely asking a question as part of the proposal, that's all."
The hearing officer found that the Canteen letters were not deviations from the specifications. He said:
* * * The provisions in the RFP on termination were somewhat ambiguous. The letter submitted by Canteen states "per specifications." This indicates that Canteen was not taking exception to the specifications.
It is true that "conditions and specifications must apply equally to all prospective bidders. Otherwise there is no common standard of competition." Hillside Tp. v. Sternin, 25 N.J. 317, 322 (1957). However, the Acting Director accepted the hearing officer's finding that Canteen Corp(s). were bidding "per specifications." The administrative decision that the Canteen letters did not render their bids nonconforming was a valid exercise of discretion. It will not be disturbed.
In view of the foregoing, the final decision under appeal is affirmed.
NOTES
[1] There were Zones 2, 3, 4 and 5. Appellant conceded at oral argument that its appeal is concerned only with these zones and that the contracts awarded for other zones are not challenged by it.
[2] In a footnote in its brief the State, in passing, touched the issue in stating that the Acting Director may have been justified in refusing to consider appellant's challenge because appellant had in fact submitted a bid on the specifications.