BURNETT GRIGGS, *ET ALS.*, PLAINTIFFS-APPELLANTS, v. THE BOROUGH OF PRINCETON, *ET ALS.*, DEFENDANTS-RESPONDENTS.

Argued October 26, 1959—Re-argued March 21, 1960—
Re-argued June 6, 1960—Decided June 28, 1960.

*Mr. Charles R. Sperling* argued the cause for the plaintiffs-appellants.

*Mr. John F. McCarthy, Jr.,* argued the cause for the defendant-respondent, The Mayor and Council of the Borough of Princeton.

*Mr. Ralph S. Mason* argued the cause for the defendant-respondent, The Housing Authority of the Borough of Princeton.

*Mr. Richard J. Casey* argued the cause for the defendant-respondent, The Planning Board of the Borough of Princeton.

The opinion of the court was delivered by
BURLING, J.

## I.

### INTRODUCTION.

This case arises from an order entered in the Superior Court, Law Division, granting defendants' motion for summary judgment in an action in lieu of prerogative writ, brought by plaintiffs to review determinations of the defendants' planning board and borough council that a certain area in the Borough of Princeton was a "blighted area" as defined by *N. J. S. A.* 40:55–21.1. Plaintiffs prosecuted an appeal to the Superior Court, Appellate Division, from the order granting summary judgment, but while the cause was pending and prior to argument there, defendants filed in this court a motion for direct certification pursuant to *R. R.* 1:10–1A, which we granted.

## II.

### FACTS.

Urban redevelopment in the Borough of Princeton, of which the planning board and council determinations com-

plained of here are but a part, began to take definite shape in early 1955 when the defendant Princeton Housing Authority was designated as the urban development agency for the borough and when the Authority enlisted consultants to prepare a preliminary report on projects to be pursued. The report, submitted to the Authority in September 1957, proposed as a redevelopment area a portion of the borough bounded by John Street on the west, by Witherspoon Street on the east, by Hulfish Street on the south, and by the borough line on the north. Of this area, the portion bounded on the east, west and south by the three streets named above and on the north by Green Street was to be immediately redeveloped. The latter area is bisected by Jackson Street, which parallels Green and Hulfish Streets. The report was accepted by the Housing Authority and submitted to the Federal Housing and Home Finance Agency as a preliminary step towards receiving federal assistance in financing the redevelopment. 42 *U. S. C. A.* § 1450 *et seq.*

In April 1958 the Housing Authority retained consultants to study the area proposed by the preliminary report to be immediately redeveloped. These consultants submitted their final report of the study to the Authority in June 1958. The report was submitted to and approved by the federal agency, permitting the next step toward federal financial assistance to be taken—local approval of the redevelopment project. Meanwhile, the Authority retained an appraiser to determine the value of the properties to be redeveloped.

The borough council, on November 12, 1958, adopted a resolution instructing the planning board to determine whether the area in the Borough of Princeton bounded by Green, Witherspoon, Hulfish and John Streets was "blighted" within the meaning of *N. J. S. A.* 40:55–21.1. The planning board set December 8, 1958, as the date on which a hearing was to be held to receive evidence concerning the question. *N. J. S. A.* 40:55–21.5 requires that the hearing body give notice of the hearing and of the affected area by publishing this information once each week for two consecu-

tive weeks in a newspaper in general circulation in the municipality the last publication to occur at least 10 days before the hearing, and by mailing such information to the owners of property located in the affected area, the mailing to occur at least 10 days before the hearing. The planning board met the notice-by-publication requirement by having the necessary information printed in a local newspaper of general circulation on November 20 and 26, 1958. The board did not mail the notices to the affected property owners, however, until December 3, 1958, 5 days before the hearing. Plaintiffs in the instant case filed written objections to the proposed blight determination with the board in accordance with *N. J. S. A.* 40:55–21.6. These objections contained the names and addresses of the objectors and requested notification of the planning board's determination.

The hearing took place as scheduled. Plaintiffs objected to the board's failure to mail the notices to the property owners within the time required by the statute, but they did not request that the hearing be postponed. Although plaintiffs and all other interested persons were afforded an opportunity to present evidence relevant to the blight questions, plaintiffs limited their opposition to cross-examination of those speaking in favor of a blight determination. Those who so spoke were Harry W. Hazard, the Executive-Director of the Housing Authority; William F. Harkins, Jr., a member of the firm of consultants to the Housing Authority who studied and reported on the area in question; and Foster D. Jemison, the appraiser employed by the Housing Authority to determine the value of the affected properties.

At the hearing, the Housing Authority consultant read for the record from an abstract of the report prepared by his firm concerning the properties in the area with which the hearing was concerned. According to this report, the affected area contains, not including "accessory buildings," 31 residential structures, two "community" facilities (a church and a former Y.M.C.A. building), and five commercial structures, three of which contain residential apart-

ments. One of the residences was constructed prior to 1900. The remaining 30 were constructed between 1900 and 1910. Nineteen are "badly dilapidated." Ten have "structural deficiencies." Two are in good condition. Of the total residences, 19 are occupied as single households. Eight are occupied by two or more families in which toilet, sanitary, and kitchen facilities are shared. Four are vacant. The two community facility buildings are in good condition. Three of the commercial buildings are of fairly recent construction and are in good condition, but two are old and in "good to fair" condition. The abstract of the report continues:

"The basic land use problem within the Area is the need for a clearer separation and definition of the residential and commercial sections.

At present the block south of Jackson Street is predominantly occupied by commercial uses related to the central business district.

The block north of Jackson Street is devoted principally to residential uses.

Because Jackson Street is a local service street, it does not have the power to serve as a strong boundary to both divide and buttress the adjacent commercial and residential uses.

This lack of a strong, permanent definition or separation between the commercial and residential areas has proven detrimental to the long-term stability of all the land usage within the area.

Until this problem of deleterious land usage is solved, the residential quality of the land north of Jackson Street, and probably beyond Green Street, will continue to decline; and the area to the south of Jackson Street will never realize its full commercial and taxable potential."

The report concludes:

"The John Street Area should be considered a 'blighted area,' as defined by N. J. Statute (*R. S.* 40:55–21.1), due to the existence of the following conditions:

(1) The serious dilapidation and obsolescence of at least 19 of the 31 predominantly residential buildings.

(2) The less serious deficiencies in another 10 of the 31 predominantly residential buildings located along Green Street.

(3) The lack of exclusive toilet, sanitary and kitchen facilities in approximately 8 of the 31 residential buildings.

(4) The deleterious land usage within the area due to the lack of a sound and definite separation of the residential and commercial areas and to faulty and obsolete street layout.

(5) The improper utilization of land within the Area as evidenced by:

(a) The need to utilize a part of the land for a new street improvement which will provide the entire Borough with an east-west street parallel to Nassau Street;

(b) The need to establish a strong separation between the residential and commercial to allow each area to develop to its full potential;

(c) The fact that such commercial development would create strong additional tax ratables and bolster the central business district as a whole."

The appraiser retained by the Housing Authority to estimate the value of the properties located in the project area also read from a prepared report at the hearing. In it the appraiser characterized the "overall condition of the structures, with approximately three exceptions, as substandard." He described the buildings as "nearly all * * * in need of repairs covering wide ranges of items," e. g., "base beams or base walls * * * roofing materials" and the like. He stated:

"Again with about 3 exceptions, each structure is in need of exterior painting and several have deterioration in exterior clapboards. Practically all dwellings are in bad need of interior work consisting of repair and replacement of plaster and general repainting of all rooms.

There are 5 dwellings which do not have central heating and rooms are heated by coal or kerosene stoves. There are also several cellars that have dirt floors and several that showed indications of frequent water condition as evidenced by dampness seen at time of inspection. Most of plumbing fixtures are obsolete type and from statements of tenants there are frequent breakdowns and also freezing of pipes during cold seasons. There were 3 toilets not in working condition found by appraiser when inspections were made.

All of the properties are of frame construction, 2 with stucco veneer and 2 with composition siding. The Jackson Street area is susceptible to fire as many fire hazards exist due to poor housekeeping, defective chimneys and antiquated electrical wiring.

This appraiser also learned that in many cases the tenants overcrowd the dwellings by renting rooms and families were con-

fined to limited quarters of dwellings. The general overall picture indicated overcrowding.

The municipality will realize much more in taxable ratables by replacement with sound structures and the general condition of the area will be greatly improved."

At the close of the hearing the planning board reserved its decision for consideration at a later time.

On December 11, 1958 the planning board met in executive session. At that time, the board concluded that the area under consideration was a "blighted area" within the meaning of *N. J. S. A.* 40:55–21.1. It adopted a report incorporating this finding, which was forwarded to the borough council, for consideration by that body. The report contained a resolution providing:

"WHEREAS, the Planning Board has duly advertised and held a public hearing on December 8, 1958, and has conducted a preliminary investigation, as set forth hereinabove, to determine whether the Area bounded by Green, John, Hulfish and Witherspoon Streets, Borough of Princeton, is, or is not, a blighted area, pursuant to *R. S.* 40:55–21.1 *et seq.*, and

WHEREAS, the Planning Board has considered the written objections filed, statements made and evidence given in support of objections, as well as statements made and evidence given in favor of a determination that the Area is a blighted area, as defined in *R. S.* 40:55–21.1 and

WHEREAS, the Planning Board finds that, on the basis of evidence and statements presented at the public hearing, the following conditions exist in the said Area: (a) the generality of buildings used as dwellings or the dwelling accommodations therein are substandard, unsafe, and dilapidated to an extent that is conducive to unwholesome living; (b) the dilapidation of buildings, except for several nonresidential properties, and the existing deleterious land uses in the Area, including the inconvenient arrangement of Jackson Street in relation to Wiggins Street and Avalon Place, are detrimental to the safety, health, and welfare of the community; and (c) generally a lack of proper utilization of the Area caused by existing land uses in the Area as a whole has resulted in an unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare;

NOW THEREFORE, Be it Resolved that the Planning Board of the borough of Princeton hereby determines that the Area bounded by Green, John, Hulfish and Witherspoon Streets, Borough of Princeton, is a blighted area, as defined in *R. S.* 40:55–21.1, and

recommends that the Mayor and Council approve this determination, pursuant to *R. S.* 40:50–21.1 *et seq.*" (*sic.*)

The borough council approved the planning board's determination of blight by a resolution passed at the borough council meeting of December 19, 1958. The resolution provided:

"WHEREAS, the Mayor and Council of the Borough of Princeton received the 'Report to the Mayor and Council by the Borough Planning Board,' dated December 11, 1958, entitled 'Preliminary Investigation to Determine Whether the Area Bounded by Green, Hulfish, John and Witherspoon Streets is or is not a Blighted Area' on December 19, 1958, and

WHEREAS, the Mayor and Council have reviewed and considered the said report submitted by the Planning Board,

NOW THEREFORE, be it Resolved that the Mayor and Council of the Borough of Princeton hereby approve, the determination that the area bounded by Green, Hulfish, John and Witherspoon Streets, Borough of Princeton, is a blighted area as defined in *R. S.* 40:55–21.1 in accordance with the resolution of the Planning Board dated December 11, 1958."

Plaintiffs were represented at this meeting and apparently were prepared to submit evidence on the merits of the blight issue, but were not afforded the privilege of the floor. On December 20, 1958 plaintiffs were served with a copy of the planning board's resolution finding the area bounded by Green, Witherspoon, Hulfish and John Streets to be blighted within the meaning of *N. J. S. A.* 40:55–21.1.

## III.

### CONFLICT OF INTERESTS.

The first question we shall consider is whether, as plaintiffs argue, certain members of the Housing Authority, the planning board, and the borough council had a "dual interest in making the determination that the area containing the properties of the plaintiffs was a blighted area." If so, that determination was invalid. Certain members of those bodies

are employed in various capacities by Princeton University. The University, in turn, holds a controlling interest in Princeton Municipal Improvement, Inc., which entity owns much property in the project area and the surrounding area (including property which certain portions of the record, as will be indicated hereinafter, suggest will be exempted from acquisition and clearance as part of the actual redevelopment of the blighted area) and which also possibly could be chosen to perform the redeveloping work.

Four members of the borough council are employed by Princeton University. They are Councilmen Colman, Coyle, Lester, and Sorenson. Colman is the head coach of the University's football team. He did not vote on the borough council's resolution approving the planning board's blight determination. Coyle is Associate Director of the University's Department of Public Information. In addition to his position on the borough council, Coyle sits as council representative on the planning board. He did not vote on the blight determination either at the board meeting of December 11, 1958, or at the council meeting of December 19, 1958. Lester is Professor of Economics at the University. Sorenson is Associate Professor of Mechanical Engineering. The latter two voted in favor of the blight determination at the December 19 council meeting.

In addition to Councilman Coyle, George R. Meyers is the only University employee sitting on the planning board, of which he is chairman. He is Superintendent of Grounds and Buildings at the University. He did not vote on the board's blight determination of December 11, 1958.

Edmund S. DeLong is chairman of the Princeton Housing Authority. He is employed by the University as Director of Public Information. He was appointed to the Housing Authority prior to his connection with the University. His public position never required him to pass judgment upon the blight determination, which under the statute, *N. J. S. A.* 40 :55–21.1 *et seq.,* is a function of the planning board and borough council.

It appears from the above undisputed facts that an invalidating dual interest existed, if anywhere, only in the persons of Professors Lester and Sorenson who, as borough councilmen, voted on the council's resolution approving the planning board's blight determination. The others mentioned above either never had an opportunity to vote on the determination or voluntarily chose not to do so.

First to be considered is the nature of the benefit which would accrue to the University from the blight determination. This requires us to examine the nature of Princeton Municipal Improvement, Inc. (hereinafter referred to as PMI) and its relation to the University.

PMI was organized by Edgar Palmer and incorporated in this State in 1925 "for the purpose of creating an attractive business area in the center of Princeton." It has engaged in numerous rebuilding projects in areas adjacent to the blighted area now under discussion and owns considerable property in the immediate location of the blighted area and within the blighted area. There is some indication in the record that the "Princeton Playhouse" movie theatre, located in the blighted area and owned by PMI, will not be acquired and redeveloped when the project in question reaches the active redevelopment stage. There also appears in the record an indication that PMI could be chosen as the redeveloper of the blighted area, which, of course, if it should occur, could profit PMI.

Princeton University owns an 86.7% interest in PMI's debentures, and 79% of its stock. Two of PMI's 13 directors, but none of its officers, have a direct employment connection with the University. One of PMI's directors employed by the University is Alfred L. Test, who is the manager of the University's real estate department. The other, Ricardo A. Mestres, is University Treasurer. It is the latter's function to represent the University's interest in PMI. He apparently has freedom of action, however, and exercises his function merely by advising the University President and Trustees of PMI's activities.

■ It is apparent that the University has a considerable stake in PMI's business. PMI, in turn, is directly affected by the blight determination. True, there is not the least suggestion that the University, PMI, or any of the individuals connected with them have realized the interlocking interests and acted with respect to them; the record contains not the least suggestion that such action was even the subject of thought and in fact we have every reason to believe that the contrary is the case and that the individuals involved were persons of integrity and motivated by sincerity of purpose. Nevertheless, it is the existence of such interests which is decisive, not whether they were actually influential. *Cf. Zell v. Borough of Roseland,* 42 *N. J. Super.* 75, 82 (*App. Div.* 1956); *Aldom v. Borough of Roseland,* 42 *N. J. Super.* 495, 502 (*App. Div.* 1956). Consequently we must hold that the employer was interested in the official action (in this case the blight determination), and we must now determine whether the employment of the municipal officials was sufficient to disqualify those officials from acting in the matter which affected their employer.

■ We may note that "the decision as to whether a particular interest is sufficient to disqualify is necessarily * * * factual * * * and depends upon the circumstances of the particular case * * *. No definitive test can be devised." *Van Itallie v. Borough of Franklin Lakes,* 28 *N. J.* 258, 268 (1958). Nevertheless, it has also been stated that "it is most doubtful that participation by a councilman in a municipal action of particular benefit to his employer can be proper in any case." *Pyatt v. Mayor & Council of Dunellen,* 9 *N. J.* 548, 557 (1952). The question is whether there is a potential for conflict, not whether the public servant succumbs to the temptation or is even aware of it. *Aldom v. Borough of Roseland,* 42 *N. J. Super.* 495, 502 (*App. Div.* 1956); *Zell v. Borough of Roseland,* 42 *N. J. Super.* 75, 82 (*App. Div.* 1956). See *Kaplan and Lillich, "Municipal Conflicts of Interest: Inconsistencies and Patchwork Prohibitions,"* 58 *Colum. L.*

*Rev.* 157, 177 (1958). In the instant case, it is true that the prime interests of Councilmen-Professors Lester and Sorenson in the University are in its academic affairs. But the same long standing association which gives these men security in their positions could tend to bind their loyalties to the University in such a manner that they would be interested in all matters affecting the institution. *Cf. Zell v. Borough of Roseland, supra,* where a member of a planning board voted on a matter affecting a church of which he was but a member, causing the appellate court to invalidate the planning board's action. The potential of psychological influences cannot be ignored. *Cf. Aldom v. Borough of Roseland, supra,* 42 *N. J. Super.,* at *p.* 507. We do not hold that these matters had an effect in the instant case. Nevertheless, we perceive the rule to be that the mere existence of a conflict, and not its actual effect, requires the official action to be invalidated. *Aldom v. Borough of Roseland, supra,* 42 *N. J. Super.,* at *p.* 502.

Nor do we find that the rule of necessity applies in this case. The Blighted Area Act requires the municipal governing body to vote its approval or disapproval of the planning board's blight determination. *N. J. S. A.* 40:55–21.7. And inasmuch as Councilmen Colman and Coyle had disqualified themselves from voting on the council's resolution concerning the Princeton Planning Board's determination, unless Professors Lester and Sorenson voted, there could be no quorum since the council numbered 6 members and without a quorum there could be no vote. Thus, it may be argued that it would not be unreasonable for Professors Lester and Sorenson to decide that it was incumbent upon them to act in the matter, even though they had realized that there existed a conflict between their personal connections and their official duties (though we do not suggest that they did so realize such a conflict existed). We hold, however, that while certain elements raising the rule of necessity are present in the instant case, nevertheless the matter being voted upon was not of such vital importance as to allow resort to the exception of

the general rule of disqualification. It was stated in an early case in this State dealing with the exception to the rule of disqualification in cases of conflict of interests that "to justify a violation of the maxim, there should be an imperative reason for it, in order to prevent a failure of justice, and in determining that, the greatest care should be exercised." *State ex rel. Winans v. Crane,* 36 *N. J. L.* 394, 399 *(Sup. Ct.* 1873). In that case, the creation of a new road had been voted and it appeared that one of the commissioners had a disabling interest in the proposal but that without his participation the measure could not be acted upon. The court stated:

"* * * No case can, I think, be found where there has not been a very peculiar and emergent necessity to justify an exception to the rule. How is it in the present matter? The failure here would only deprive the township of a road which the inhabitants could more than likely get along without, until the legislature provided for the difficulty, or until the disability was removed." 36 *N. J. L.,* at *p.* 400.

Such, we hold, is the situation in the instant case: the blight determination may be laid aside until the council is free to act. The exception to the rule arises in situations of *stern* necessity, *Pyatt v. Mayor & Council of Dunellen, supra,* 9 *N. J.,* at *p.* 557, and that requirement is not present in the instant case.

We realize that the effect of this decision may be to limit the number of employees of Princeton University who may sagely hold certain offices in municipal government. This could exclude from participation in local government persons unusually qualified for such service; it is safe to assume that such participation by the persons whose interests we hold here to be disqualified was in fact motivated by a high sense of responsibility for community affairs. But the application of the basic principle here involved cannot depend upon an appraisal of the nature of the institution concerned or of the character of the individual officeholders.

We hold, therefore, that the borough council's resolution approving the planning board's blight determination was invalid. Since the resolution was a necessary step in the procedure under the Blighted Area Act, *N. J. S. A.* 40:55–21.7, it is apparent that plaintiffs are entitled to prevail as a matter of law. However, the procedural posture of this litigation, being before this court on defendants' motion for summary judgment without a similar motion having been made by plaintiffs, makes it inadvisable for us to give final judgment at this stage of the proceeding. *R. R.* 4:58–3. Thus the matter must be remanded to the trial court where plaintiffs may move for summary judgment in their favor based upon this opinion.

## IV.

### OTHER QUESTIONS.

The above decision is sufficient to dispose of the instant litigation. Other procedural issues presented by the case, however, concern subjects of public importance warranting consideration at this time.

### (a).

Plaintiffs contend that the resolution of the borough council approving the planning board's blight determination was invalid. This argument is based on *N. J. S. A.* 40:55–21.8 which provides:

"Where written objections shall have been filed and the determination is that an area is a blighted area, no further proceedings shall be taken by the governing body of the municipality upon such determination until thirty days shall have elapsed after such determination. If within said thirty-day period an action to review the determination is commenced in the Superior Court, no further proceedings shall be taken by the said governing body upon such determination during the pendency of such action."

Plaintiffs had filed written objections with the planning board prior to the board's hearings on the proposed blight

determination. The board's determination, as stated above, was that the area was blighted within the meaning of *N. J. S. A.* 40:55–21.1. This determination, in accordance with *N. J. S. A.* 40:55–21.7, was submitted to the borough council for approval, disapproval, or modification. *N. J. S. A.* 40:55–21.7 further provides that this action "shall be taken by the said governing body within thirty days after the submission of said report" of the planning board. Since the council's approval was given within nine days of the planning board's determination, the action was timely under *N. J. S. A.* 40:55–21.7. But plaintiffs argue that although *N. J. S. A.* 40:55–21.7 requires the governing body to act on the planning board's report within 30 days after it is submitted, *N. J. S. A.* 40:55–21.8 provides that where written objections are filed (pursuant to *N. J. S. A.* 40:55–21.6) "no further proceedings shall be taken by the governing body of the municipality upon such determination [that an area is a blighted area] until thirty days shall have elapsed after such determination." Thus plaintiffs conclude that since written objections were filed in this case the borough council's approval within nine days of the submission of the planning board's report was improper.

So construed, there is an apparent inconsistency in the Blighted Area Act, *N. J. S. A.* 40:55–21.1 *et seq.* Section 7, apparently without exception, requires the borough council to act on the planning board's report within 30 days of its submission. But section 8, as construed by plaintiffs, would prohibit further proceedings by the borough council for 30 days after a "determination * * * that an area is a blighted area" where written objections are filed. It might be argued that such delay should be considered in connection with the additional provisions of *N. J. S. A.* 40:55–21.8 which state that if, within the 30 day period, an action to review the blight determination is filed in the Superior Court then the council shall take no further proceedings "upon such determination during the pendency of such action." Thus it could be contended that the statute contemplates

review of the planning board's determination prior to the borough council's approval, disapproval, or modification. The weakness of this argument is apparent, however. Not only would judicial review at this stage seem to be premature, see *R. R.* 4:88–14, but it is inconsistent with *N. J. S. A.* 40:55–21.9 which expressly provides for judicial review under the Blighted Area Act "within thirty days after the determination *by the governing body* * * * by final action upon a report by a planning board." (Emphasis added.)

The pattern of the statute in question logically appears by construing "further proceedings" in *N. J. S. A.* 40:55–21.8 not to refer to the borough council's approval, etc., of the planning board's report, but to action taken under *N. J. S. A.* 40:55–21.10 and 21.11 should the area finally be determined to be blighted. Under this construction, the planning board's report must under all circumstances be acted upon by the borough council within 30 days after its submission. *N. J. S. A.* 40:55–21.7. Then if any written objections contemplated by *N. J. S. A.* 40:55–21.6 have been filed, the council may take no action under *N. J. S. A.* 40:55–21.10 and 21.11 for 30 days after its action on the planning board's report, or, if an action for judicial review under *N. J. S. A.* 40:55–21.9 is filed during the thirty-day period, the borough council may not act under *N. J. S. A.* 40:55–21.10 and 21.11 during the pendency of such action. This construction of the Blighted Area Act is that most consistent with the apparent legislative purpose determined from "the context of the whole statute, its purposes, and the circumstances under which the words were employed * * *." *Grogan v. DeSapio,* 11 *N. J.* 308, 323 (1953). So construed, it is clear that the borough council's approval of the planning board's blight determination was made within the time contemplated by the statute.

(b).

Plaintiffs contend that the planning board's failure to provide plaintiffs with 10 days' notice of the hearing on the

proposed blight determination by mail invalidates the entire procedure taken by the borough under the Blighted Area Act with respect to the project in question. This argument is without merit.

■■ Plaintiffs were mailed the proper notice within five days of the hearing. In addition, proper notice by publication was given. Furthermore, plaintiffs had an opportunity to request a postponement of the hearing in order to obtain time to prepare for it, but they failed to make such a request. In sum, even if it is assumed for purposes of argument that due process requires actual notice of the planning board's hearing to be given to affected parties, it appears that plaintiffs were not deprived of such actual notice and, even if they were, that they cannot now complain because of their inaction at the appropriate time, *i. e.,* at the hearing, when an objection directed to the question of actual notice and opportunity to prepare could have been met by the simple expedient of postponing the hearing. And, due process objections disposed of, it is clear that the statute does not contemplate that failure to provide the requisite notice will invalidate the blight determination. Concerning notice by mail, the statute expressly provides that "failure to mail any such notice shall not invalidate the investigation or determination thereon," *N. J. S. A.* 40:55–21.5.

### (c).

■■ Plaintiffs complained that the borough council's failure to afford plaintiffs an opportunity to be heard and to present evidence on whether the borough council should approve, disapprove, or modify the planning board's report on the blight determination denied plaintiffs of their rights. It is clear, however, that the statute neither expressly nor by implication provides for such a hearing, albeit as a matter of public relations, it would be advisable for such views to be permitted to be expressed. The statute only contemplates a hearing by the planning board, at which plaintiffs had an opportunity to be heard and at which plaintiffs did partici-

pate to the extent of cross-examination of witnesses supporting a position different from plaintiffs. It is equally clear that, concerning the blight determination, plaintiffs are not constitutionally entitled to a hearing or to present evidence on the matter. *Wilson v. City of Long Branch,* 27 *N. J.* 360, 385–386 (1958), *certiorari* denied 358 *U. S.* 873, 79 *S. Ct.* 113, 3 *L. Ed. 2d* 104 (1958). For the same reason, the proceedings in question were not defective by reason of the borough council's acting on the planning board's report before that report was served upon plaintiffs as written objectors as provided by *N. J. S. A.* 40:55–21.6. Such timing would be crucial only if plaintiffs were able to act in some manner to influence the borough council's decision, *i. e.,* by presenting evidence tending to rebut the planning board's determination. Plaintiffs have no such ability in this case, either under the statute or by virtue of a constitutional right.

A number of other issues relating to the merit of the determination of blight were presented. In view of our conclusion that two of the members of the governing body were disqualified it would be inappropriate for us to consider the validity of a discretionary determination in which they participated.

## V.

### CONCLUSIONS.

The cause is reversed and is remanded to permit plaintiffs an opportunity to move for summary judgment on the issue of conflict of interests and for proceedings not inconsistent with this opinion.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For affirmance*—None.