KEYES MARTIN & COMPANY, APPELLANT, v. DIRECTOR, DIVISION OF PURCHASE AND PROPERTY, DEPARTMENT OF TREASURY, STATE OF NEW JERSEY, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 1, 1984—Decided September 5, 1984.

Before Judges ANTELL, McELROY and BRODY.

*Arthur D'Italia* argued the cause for appellant (*Chasen, Leyner, Tarrant & D'Italia,* attorneys; *Ellen S. Delo* on the brief).

*Joseph L. Yannotti,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel and *Joseph L. Yannotti* on the brief).

The Opinion of the Court was Delivered by,

ANTELL, P.J.A.D.

This is an appeal from a determination by the Director of the Division of Purchase and Property, Department of the Treasury ("Division"), rejecting appellant's low bid for a two year advertising contract with the New Jersey Lottery Commission. The action under review followed a recommendation by the Attorney General on the ground that to award the contract would erode public confidence in the Lottery Commission. The Attorney General's recommendation was based on his belief that appellant had maintained a business relationship with the Chairman of the Lottery Commission.

On January 19, 1983 appellant and six other bidders submitted bid proposals in response to the Division's request therefor from advertising and public relations agencies "to advertise, promote, market and generally further the development and financial growth of the New Jersey State Lottery...." Appellant was then already performing promotional and advertising services for the Lottery Commission under a two year contract which had been awarded by the Division in September 1980 and which was thereafter extended for six months by vote of the Lottery Commission on June 9, 1982. An Evaluation Committee found that appellant was the best qualified bidder with a score of 84.2 out of a possible 100 under established technical evaluation criteria, 8 points higher than

the next best qualified bidder. Appellant was also the lowest bidder.

Sometime in January or February 1983 it was publicly disclosed that Mr. Reese Palley, then Chairman of the Lottery Commission, had engaged in certain business activities with appellant and also with another company which was, in certain respects, subject to the jurisdiction of the Lottery Commission. On or about March 23, 1983 the Executive Commission on Ethical Standards filed a complaint against Reese Palley charging him with violations of the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 *et seq.*, and the Lottery Code of Ethics. On April 29, 1983 he was indicted by the State Grand Jury and on May 9, 1983 the Governor suspended him as a member of the Lottery Commission "pending disposition of the Indictment and resolution of the Conflicts of Interest charges...." It appears that the Code expressly prohibits members of the Lottery Commission from engaging in business relationships with vendors serving the Commission. It does not, however, contain a corresponding prohibition applicable to the vendors. Nevertheless, on May 16, 1983 the Attorney General wrote to the State Treasurer that because of the business relationship between Mr. Palley and appellant an award to appellant of the Lottery Commission's advertising contract would "seriously erode public confidence and trust in the integrity of that agency." The business relationship upon which the Attorney General rested his opinion can be briefly described.

(1) In July 1982, as a representative of China Interface Corporation (China Interface), a private company in which he was interested, Palley visited the Republic of China. Before leaving, he advised Daniel Gaby, president of appellant, that he was going to China and would let Gaby know if he saw anything which might be of interest to appellant. Gaby replied that this was "fine." When he returned, Palley told Gaby that he had advanced $150 on appellant's behalf to a consultant and $50 for an interpreter. Although these advances were unau-

thorized, Palley was reimbursed by appellant because, according to Gaby, of Palley's "good intentions and the amount involved...."

(2) In August 1982 Palley proposed that Gaby participate as a 16½% stockholder in China Interface. Although Palley's diary shows that Gaby agreed to this, Gaby denies it, and it is clear that the transaction never materialized.

(3) In September and October 1982 appellant placed certain advertising in the Wall Street Journal on behalf of China Interface. China Interface was thereafter billed $812.50 for placing the ad and $96.55 for production costs. According to the evidence 15% was retained by appellant as its fee and the balance was remitted to the Wall Street Journal.

(4) In September and October of 1982 Palley recommended the services of appellant to certain third parties. Palley was then in the process of negotiating a beer importing agreement on behalf of China Interface and unsuccessfully tried to have appellant brought into the promotional end of the transaction.

(5) In response to Palley's solicitation, appellant submitted a proposal to provide advertising services for a beer which China Interface was contemplating for import into the United States during November and December 1982. In doing so, appellant dealt directly with Nathan Rothman, the president of China Interface, and a member of his staff. The proposal was never accepted.

It is evident that the initiative in pursuing whatever relationship existed was at all times undertaken by Palley and that appellant's role therein was almost entirely passive. The Attorney General also claimed that during the period of the earlier contract between appellant and the Lottery Commission Palley took part in monthly evaluations of appellant's performance and voted on June 9, 1982 to extend appellant's contract for an additional six months. Palley's vote on appellant's contract is a matter of record, but appellant notes that it occurred prior to the other events previously recounted. Appellant denies that

there were any claimed monthly evaluations of its performance. As to this, the Director made no findings, although the hearing officer appointed by the Director found that both the Commission and Palley "did have implicit review authority" of appellant's performance.

On May 31, 1983 the Deputy Director rejected appellant's bid, as recommended by the Attorney General and the Lottery Commission by resolution of May 25, 1984. The latter was also based on the Attorney General's opinion and asked that the contract be awarded to the second lowest bidder. Appellant petitioned the Director for a hearing June 9, 1983. A hearing officer was appointed and after an informal conference on June 26, 1983 his report was filed July 7, 1983. On July 26, 1983, after it examined the hearing officer's report, the Lottery Commission by resolution concluded

> that based on the business relationship between Reese Palley and Keyes Martin, an award to Keyes Martin would not be in the public interest in that any appearance of wrong doing may impair public confidence in the integrity of the operation of the State lottery which is based primarily upon public confidence and whose operations are essential to the fiscal health of the State. . . .

The Director's determination, from which this appeal is taken, is dated July 29, 1983. He concluded that appellant's bid was not the most advantageous "under the circumstances," grounding this decision in the same rationale as that expressed in the July 26, 1983 resolution of the Lottery Commission. The contract was awarded instead to the second lowest bidder.

It should be emphasized that the action under review rests upon what the Director conceived was the "appearance of wrong doing;" nowhere is a claim of actual wrongdoing suggested. The hearing officer, in fact, specifically found that what occurred was a "legitimate business arms-length relationship between two firms, Keyes Martin and China Interface, both of which happen to have some involvement with Mr. Palley," and that "no decision in [appellant's] business transactions included special favors based on Mr. Palley's position." Furthermore, both the hearing officer and the Director made it a point to say that appellant would not be precluded from

bidding on future Lottery contracts. It is therefore clear that the Director's action was in no way colored by a belief that appellant's conduct evidenced a lack of moral responsibility.

The question presented is whether it lay within the lawful discretion of the Director to reject appellant's low bid for the sole reason that the business relationship which he found to exist between appellant and the Chairman of the Lottery Commission gave rise to such an appearance of wrongdoing as, in the Director's mind, to erode public confidence in the integrity of the Lottery Commission. The answer must be found under the terms of the Public Bidding Statute, *N.J.S.A.* 52:34-6, which provides that all contracts to be paid out of State funds may be awarded only after public advertisement for bids. *N.J.S.A.* 52:34-12(d) insofar as applicable directs that the

> award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered. Any or all bids may be rejected when the State Treasurer or the Director of the Division of Purchase and Property determines that it is in the public interest so to do.

 Our appellate function is clearly circumscribed. The Director and the State Treasurer have been vested with a broad discretion and we are not free to substitute our judgment for theirs. *Commercial Clean. Corp. v. Sullivan,* 47 *N.J.* 539, 548–549 (1966). In the absence of bad faith, corruption, fraud or gross abuse of discretion we are not free to interfere. *Id.* at 549. No claim is here made of bad faith, fraud or corruption and the issue must therefore be resolved in terms of whether the Director's action constituted a gross abuse of discretion. "It is firmly settled that arbitrary and capricious action by an administrative or executive agency should be overturned." *Worthington v. Fauver,* 88 *N.J.* 183, 204 (1982). Although the statute does not mandate that the contract be awarded to the lowest responsible bidder, *Id.* 47 *N.J.* at 548; *Blondell Vending v. State,* 169 *N.J.Super.* 1, 11 (App.Div.), certif. den. 81 *N.J.* 333 (1979), "[t]his is not to say the low bid may be ignored or treated as a minor consideration. It is a factor of great

importance and not to be lightly discarded." *Commercial Clean. Corp. v. Sullivan, supra,* 47 *N.J.* at 548.

Cases are numerous in which the Director's action in rejecting a low bid have been sustained. However, we have been cited to no authority where, absent a finding of actual wrongdoing, the Director was permitted to reject the lowest responsible bid by the best qualified bidder only on his subjective perception that the public might otherwise discern an appearance of wrongdoing. Cases where the discretion was found to be lawfully exercised "in the public interest" seem to be based on matters internal to the bidding process itself or related in some way to inadequacies of the bidder. In *Commercial Clean. Corp. v. Sullivan, supra,* the bid was rejected because of the bidder's lack of experience and sufficient equipment to handle the building maintenance contract there involved. In *Trap Rock Industries, Inc. v. Kohl,* 59 *N.J.* 471 (1971), *cert.* den. 405 *U.S.* 1065, 92 *S.Ct.* 1500, 31 *L.Ed.*2d 796 (1972), corporate bidders had been suspended by the State Department of Transportation from bidding on its contracts for the reason that criminal indictments were then pending against their principals. The Supreme Court upheld this action on the ground that the circumstances revealed a lack of moral responsibility on the part of the bidder, reasoning that the "moral responsibility of a corporation is one and the same with the moral responsibility of the individuals who give it direction." *Id.* 59 *N.J.* at 482. In *Motorola Com. & Electronics v. O'Connor,* 115 *N.J.Super.* 317 (App.Div.1971) the low bid rejected was found by the Director to be inferior in quality to that of others in terms of equipment to be supplied.

■ Basic to the doctrine of judicial deference to the policy views of an agency action is the premise that the agency is endowed with special insights beyond the competence of the judiciary to understand technical matters at issue. *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599 (1965); *Bergen County Freeholder Bd. v. Bergen Cty. Pros'r,* 172 *N.J.Super.* 363, 369

(App.Div.1980); *In re application of Howard Savings Bk.*, 143
*N.J.Super.* 1, 11 (App.Div.1976). In our view, the "appear-
ances" criterion is in no way validated by the Director's exper-
tise as chief contracting officer for the State. The expertise
which renders his actions proof against judicial intervention
relates to matters of business judgment, *In re Honeywell
Information Systems, Inc.*, 145 *N.J.Super.* 187, 200 (App.Div.
1976), certif. den. 73 *N.J.* 53 (1977), and we cannot conceive that
the Legislature intended him to act on the basis of his personal
view of what the "public interest" requires outside the scope of
business considerations.

■ Permitting the Director to reject bids where he opines,
without finding any substantiating facts, that the "public" will
question the Lottery Commission's integrity presupposes his
infallibility over matters as to which all judgments are subjec-
tive and one person's guess is as good as another's. It removes
all meaningful restraints on his discretion. Unless we are
prepared to make the arbitrary judgment that only business
relationships, and not other kinds of relationships, can create
the appearance of wrongdoing, we see no limit to the kind of
associations which could form the basis for similar action in
other cases involving not only the Lottery Commission, but
other agencies as well. It would seem to follow as a matter of
principle that bidders having social, political, ethnic or family
relationships or close friendships with members of a user
agency could also be rejected, notwithstanding that their bid is
clearly the most advantageous to the State. Membership in the
same country club or in the same athletic, religious, recreation-
al or civic organization could also logically form the basis for
such action, as would, certainly, financial contributions to a
particular political party. All that need be found to support
such results is an unreasoned belief on the part of the Director
that "people will think" the contract was improperly awarded
because of the bidder's relationship to an agency official even
though the relationship involves, as here, no suggestion of

favoritism, corruption or any other form of legal or moral wrongdoing. In our view this is unacceptable, and we observe that the agency official, ironically, does not even award the contract. This is done by the Director as the head of an entirely separate agency.

At the heart of the problem is the complete obscurity of the standard on which the Director acted. The "appearance of wrongdoing" standard is no standard at all. It is completely non-objective. "Appearances" exist only in the eye of the beholder. Whether certain circumstances give rise to an appearance of wrongdoing merely provokes the further question of "appearance to whom?" Do we speak of a cynical public or a trusting public? a public which is informed as to the facts, partially informed or uninformed? Do we speak of a reasonable public or one with a fixed mind as to how the public business is carried out? How can an appropriate factual record be prepared, and how does a reviewing court determine whether this vague finding is supported by substantial credible evidence in the record? While there can be no question as to the high ethical plane on which the Director has made his judgment, it is equally true that his chosen standard is beyond the reach of meaningful appellate review. No one but the Director can know precisely what was decided and why.

The facts before us illustrate these difficulties. Appellant not only submitted the lowest responsible bid, it was also found by a significant margin to be the best qualified bidder to provide the solicited services. It had served the Lottery Commission for more than two years on the prior contract and during this time the Commission Chairman and the president of appellant became acquainted. As a result, Mr. Palley tried to develop a working relationship between a company with which he was affiliated and the appellant. No codified standard of law, regulation or ethics precluded a bid from firms having such a relationship and bidders could therefore only guess as to

what was expected of them in this respect.* Apart from a reimbursement of $200 by appellant to Palley for expenses incurred in China and the placement of a newspaper ad by appellant for China Interface, for which appellant realized a commission of perhaps $120, there was little that came of their discussions. An impartial hearing officer found that their dealings were all arms-length transactions and that no favoritism was shown in deference to Palley's position on the Lottery Commission. Because there had been no lapse of moral responsibility by appellant the Director decided that it would not be barred from bidding on future Lottery Commission contracts. Furthermore, as we pointed out earlier, neither Palley nor, for that matter, the Commission itself was authorized to decide upon the successful bidder. This could be decided only by the Director of the Division of Purchase and Property, so that any question of a conflict of interest seems not to be present. Indeed, at the time the Director made his decision Palley had already been removed from his position on the Lottery Commission. For the Director, or anyone else, to conclude that an ordinarily intelligent, reasonable person who has examined the facts might lose confidence in the integrity of the Lottery Commission if the contract were awarded to appellant would be wholly speculative. In our view, important governmental decisions should not be based on hunches such as this.

■ As we noted earlier, the source of authority relied on for the action under review is that language of *N.J.S.A.* 52:34–12(d) which permits the Director to reject bids when he determines it

---

*After the Director's determination, and at the recommendation of the hearing officer, the Lottery Commission adopted an ethical standard which is made part of all requests for proposals to bid for Lottery Commission contracts which precludes its vendors from maintaining any "business relationship" with any Lottery Commissioner, officer or employee. The question arising therefrom is whether the vendors are now free to maintain other kinds of relationships with the Commissioners, or whether they may do so only at peril of having their bids rejected because the Director may later think their particular relationship may give rise to an appearance of wrongdoing.

is in the public interest to do so. The concept of "public interest" is, of course, of great breadth and ordinarily only the legislature may decide what is required thereunder in the broad sense of the term. Although it is "settled that the Legislature may not vest unbridled or arbitrary power in the administrative agency...," *Ward v. Scott*, 11 *N.J.* 117, 123 (1952) we do not suggest that this enactment is an unconstitutional delegation of legislative power since it is clear to us that the right to reject bids in the public interest may only be exercised within narrow limitations. It is equally clear that these limitations, which are essential to the law's constitutionality, preclude so broad an interpretation of the "public interest" criterion that the Director may reject bids on his subjective determination that the public will otherwise perceive the appearance of misconduct. This will be shown in the discussion to follow.

█ Statutes using general empowering language such as "public interest" may be sustained where accompanied by standards giving clear direction as to how the power should be exercised. In *Mt. Laurel Tp. v. Public Advocate of N.J.*, 83 *N.J.* 522, 532–33 (1980) Justice Clifford explained the need for such standards in the following way:

> The requirement that standards accompany the delegation of power serves three basic purposes. First, it prevents the Legislature from abdicating its political responsibility and prevents undemocratic, bureaucratic institutions from wielding all-encompassing, uncontrollable government power. Second, limiting standards define the area in which the agency develops the experience and expertise that the legislature has neither the time nor resources to develop. With too broad a standard the agency stands in no better position than the legislature that created it. Third, and most important, standards facilitate judicial review of agency decisions, which guards against arbitrary and capricious governmental action. As long as the statutory standards achieve these purposes, such standards should be considered sufficiently definite to pass constitutional muster.

The question considered in *Mt. Laurel Tp., supra,* centered on the constitutionality of the language in *N.J.S.A.* 52:27E–29 which authorized the Public Advocate to represent the "public interest" in administrative and court proceedings. The Supreme Court there concluded that the statute's constitutionality

was satisfied by the fact that the "Public Advocate must look to court decisions and existing laws to determine a clear public interest and thus channel his discretion." *Id.* at 533. The principle applied was that a delegation of legislative power is not unconstitutional so long as the discretion of administrative officers is " 'hemmed in by standards sufficiently definitive to guide its exercise,' " *Id.* at 532, citing *Cammarata v. Essex County Park Comm'n,* 26 *N.J.* 404, 410 (1958).

And in *Elizabeth Federal S. & L. Ass'n v. Howell,* 30 *N.J.* 190 (1959) the Court held that the "public interest" was constitutionally acceptable as a standard to guide the Commissioner of Banking and Insurance in granting applications to maintain a branch banking office where the term was considered within the statutory context. It was there found sufficiently specific in light of the "overall objective of the statute to achieve a sound banking structure, healthily competitive, and fully adequate for the needs of the community." *Id.* at 194.

What emerges is that the required standards may be found by examining "the entire act in the light of its surroundings and objectives" in recognition that a " 'statute often speaks as plainly by inference, and by means of the purpose which underlies it, as in any other manner. That which is clearly implied is as much a part of the law as that which is expressed.' " *Ward v. Scott, supra,* 11 *N.J.* at 123, quoting from *Brandon v. Montclair,* 124 *N.J.L.* 135, 143 (Sup.Ct.), aff'd 125 *N.J.L.* 367 (E. & A. 1940). See also *Avant v. Clifford,* 67 *N.J.* 496, 550 (1975).

Turning to the competitive bidding statute before us we see that its purpose is "to secure competition and to guard against favoritism, improvidence, extravagance and corruption." *Trap Rock Industries, Inc. v. Kohl, supra,* 59 *N.J.* at 479; *Hillside Twp. v. Sternin,* 25 *N.J.* 317, 322 (1957); *Weinacht v. Bd. of Chosen Freeholders of County of Bergen,* 3 *N.J.* 330, 333 (1949).

The Director contends that his rejection of appellant's bid should be affirmed because he thinks the public may see the appearance of wrongdoing even though there is no wrongdoing. But we find this sustainable under none of the foregoing broadly stated legislative purpose guidelines which are constitutionally essential to fix limits on the otherwise vaporous public interest test of *N.J.S.A.* 52:34–12(d). Simply stated, "public interest" may not be read to mean anything the Director chooses it to mean.

Absent a finding of actual wrongdoing by the bidder, rejection of the low bid on the Director's perception that to do otherwise would undermine public confidence in the integrity of the Lottery Commission constituted the exercise of a power nowhere implied by the empowering statute. That the Division itself has recognized this is to be so is evidenced by its own regulations. *N.J.A.C.* 17:12–7.1 specifically provides for debarment hearings under the Administrative Procedure Act for numerous forms of actual misconduct by the bidder. We do not conceive that the Division would have made provision for hearings in cases involving a prospective bidder's lack of moral responsibility and actual wrongdoing, but not where the mere appearance of wrongdoing is involved had the Division believed that the latter sufficed as a reason for debarment.

In arguing for affirmance of the Director's action the State urges that we give special weight to the sensitivity of the Lottery Commission to public scrutiny. The State's contention that this body must "be untainted by any suspicion of unethical conduct" has not been overlooked. But this much is expected of all State agencies, and we see no principled basis on which to say that the Director may reject bidders for contracts with the Lottery Commission under criteria distinctly different from those applicable to other user agencies. If bids may be rejected simply on the Director's feeling that the contract may not "look good" to the "public" because the Chairman of the Commission, not the bidder, breached his obligations, it is difficult to con-

ceive that technically qualified contractors will long continue to invest their time and money in preparing bids for public contracts. By sanctioning a palpable injustice of the kind here presented we only encourage the growth of conditions under which the user agency will lose the benefit of genuinely competitive bidding. See *Funderburg Bldrs. v. Abbeville Cty. Mem. Hosp.,* 467 *F.Supp.* 821, 825 (D.S.C.1979).

Moreover, although there can be no question of the necessity to protect the Lottery Commission's image of unblemished integrity, this, like other meritorious objectives, may only be accomplished within recognized limitations and with due concern for the image of justice. Urgent as the necessity may be, it does not displace our first priority, to maintain the integrity of tested and settled legal principles.

In view of the fact that appellant is the best qualified and lowest responsible bidder, and no other reason appearing as to why its bid is not the most advantageous to the State, the Director's award to the second low bidder is vacated and it is directed that the contract be awarded to appellant.

Reversed.

BRODY, J.A.D., dissenting.

The Director of the Division of Purchase and Property (the Director) erred in the standard he applied and the procedures he used in rejecting the Keyes Martin bid. Deferring to what he understood to be the view of the Lottery Commission (the Commission), the Director concluded that "public confidence in the integrity of the lottery operations would be impaired" if Keyes Martin engaged in "any business relationship" with Palley while Palley was the Commission chairman and Keyes Martin its advertising agency. By expressly declining to consider "the extent of the relationship," the Director could have rejected the bid because Keyes Martin had merely purchased a trinket at Palley's Atlantic City Boardwalk store. Without

specific findings we do not know the basis for his action and must reverse.[1]

I dissent because, unlike the majority, I would not simply reverse and award the contract to Keyes Martin in the face of still unanswered questions concerning its private business dealings with Palley while he was the Commission chairman. These dealings and an unsuccessful attempt to engage in similar dealings with another vendor, Syntech International, Inc., produced conflicts of interest charges against Palley before the Executive Commission on Ethical Standards (the Ethics Commission) and an indictment charging him with criminally obstructing the investigation of the charges regarding Syntech. These startling events occurred while bids were being considered and Palley was still a Lottery Commissioner. Both proceedings were pending when the Director awarded the contract to Venet Advertising, Inc. and they are still pending. Only Palley faces formal charges. However, if he unlawfully engaged in a six-month course of private business dealings with a major Commission vendor such as Keyes Martin, it would be reasonable to infer that the vendor is also tainted and could therefore be suspended from the bidding process while its involvement is being investigated. This is especially so where the dealings were forbidden so that Palley as a Commission member would not favor or have reason to favor the vendor at the expense of the public weal. I would therefore remand for proper proceedings and findings.

The success of the State Lottery, an important source of public revenue, depends upon the effectiveness of its advertising. Unlike most State vendors, the Lottery's advertising

---

[1]The Director noted in his opinion that the hearing officer "found that Keyes Martin 'adequately established' its position that 'no decision in their business transactions included special favors based on Palley's position.'" But he neither accepted nor rejected that conclusory finding because he determined that "the existence of *any relationship*" between them warranted rejection of the bid. [Emphasis in original.]

agency works continuously with the Commission and its Director. An agency representative attends Commission meetings. At almost every meeting the Commission considers new advertising ideas, including changes in the way the games are played, and authorizes or curtails advertising expenditures. There is no rigid advertising budget. The amount spent in advertising, and therefore the income of the advertising agency, is continually determined by the Commission throughout the year. The request for proposals to bid on the present contract requires bidders to assume a minimum two and a half million dollar annual advertising budget.

Keyes Martin was the Commission's advertising agency under a September 1980 two-year contract. The Commission extended the contract for six months in June 1982 without competitive bidding after its Director reported that she needed more time to prepare the request for proposals for the new contract. There is evidence that shortly thereafter, Palley, acting on behalf of China Interface Corporation (China Interface), undertook increasingly more intensive business dealings with Keyes Martin which ended abruptly in January 1983 when he learned that these transactions were the subject of an investigation by the Attorney General. Palley owned one-third of China Interface stock.

Although the majority tend to minimize the extent of those dealings and the casualness of Palley's participation in them, we have no findings and there is evidence to the contrary. For example, the majority state that Palley merely "recommended the services" of Keyes Martin "to certain third parties." One recommendation is contained in an October 22, 1982 letter to a business associate. Its fervor is demonstrated by the following hyperbolic excerpt:

> Most important is redesigning of label and carrier. I suggest that you immediately contact Dan Gaby at his advertising agency.
>
> Keyes Martin, Inc.
>
> (201) 376–7300

Ask him to redesign the product for the market. His agency has a contract to handle all of Chinese advertising and promotion in things from Shanghai and he would be extremely important to you. He has just returned from Shanghai and knows and understands the people here very well. His imprimature [*sic*] on this project will not do you any harm. I am sending him a copy of this letter.

In addition to sending Gaby a copy of the letter, Palley wrote to Gaby the next day stating in part, "I insisted that you be brought into the promotion end as the creative agency because of your 'experience in China.'" There is no evidence in this record that Keyes Martin had any experience in China except for Palley's activities there on its behalf.

As another example, the majority correctly state that Gaby denied agreeing to purchase the China Interface stock Palley was promoting. However, Gaby also admitted telling Palley that he "would seriously consider the matter;" he had his secretary open a China Interface file and placed in it a memo from Palley concerning the "internal structure" of China Interface; and he never turned down Palley's offer. The Attorney General's investigation became known in January, two months before the date noted in Palley's diary when Gaby would pay for the stock.

By the time the Attorney General's investigation became publicly known, the contract had already been advertised and bids were in. The Director appointed an Evaluation Committee composed of staff from the Commission and the Division of Purchase and Property to review the bids. On the basis of cost and quality-of-work factors, the Committee recommended that the contract be awarded to Keyes Martin. The Committee recommendation was filed March 22. The next day the Ethics Commission filed a complaint against Palley charging that China Interface's dealings with Keyes Martin and Syntech violated the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 *et seq.*, and the Lottery Commission Code of Ethics.

The next two months leading up to the May 31 contract award to Venet were hectic and traumatic for all concerned. On April 19, 1983 the Attorney General's office advised the

Commission that a grand jury was hearing evidence against Palley in connection with his business dealings with Syntech. Like Keyes Martin, Syntech received a bill from Palley for reimbursement of the fees of a consultant and an interpreter Palley claimed to have engaged on its behalf during his July trip to China.[2] Unlike Keyes Martin, Syntech refused to pay the bill.[3]

The Commission had already extended the Keyes Martin contract another month and the Attorney General requested one more month's extension to allow time for the grand jury to act before the new contract was awarded. At its April 28 meeting, which Palley did not attend, the Commission understandably denied this request. Although it was vital to have a functioning advertising agency, in light of the charges brought against Palley the Commission could not countenance the spectacle of giving more business to Keyes Martin—at least while Palley was still one of its members. The next day Palley was indicted.

Palley refused to resign from the Commission. On May 9 the Governor suspended him "as a Member of the New Jersey Lottery Commission, pending disposition of the Indictment and resolution of the Conflicts of Interest charges before the Executive Commission on Ethical Standards." A week later the Attorney General wrote the Treasurer a letter advising that the Director should reject the Keyes Martin bid. He said that to award the contract to Keyes Martin in the face of the conflicts of interest charges pending before the Ethics Commission "would impair public confidence in the integrity of the operations of the State lottery." Two days later the Director, by his

---

[2]The Syntech bill was for $675 because it included additional items of "out-of-pocket expenses."

[3]The indictment charges that Palley fabricated and forged evidence that purported to blame his secretary for mistakenly sending the Syntech bill without his knowledge.

deputy, reconvened the Evaluation Committee and it issued a new report on May 23 recommending that the contract be awarded to Venet. The Lottery Commission concurred by resolution of May 25 and the Director awarded the contract. The precise question in this case is whether the Director was justified in awarding the contract to Venet and not Keyes Martin on May 31.

In adopting the New Jersey Conflicts of Interest law, the Legislature expressly found that public officials must "avoid conduct ... which creates a justifiable impression among the public that [the public] trust is being violated." *N.J.S.A.* 52:13D–12(a). The act itself establishes specific standards of conduct and authorizes others to be established by each agency of government "to meet [its] specific needs and conditions." *N.J.S.A.* 52:13D–12(b). Pursuant to *N.J.S.A.* 52:13D–23, the Commission adopted its own Code of Ethics which was duly approved by the Ethics Commission.

An agency code must conform to eight "general standards" of prohibited conduct listed in *N.J.S.A.* 52:13D–23(e). The list includes:

(1) No State officer or employee should have any interest, financial or otherwise, direct or indirect, or engage in any business or transaction or professional activity, which is in substantial conflict with the proper discharge of his duties in the public interest.

. . . .

(4) No State officer or employee should act in his official capacity in any matter wherein he has a direct or indirect personal financial interest that might reasonably be expected to impair his objectivity or independence of judgment.

(5) No State officer or employee should undertake any employment or service, whether compensated or not, which might reasonably be expected to impair his objectivity and independence of judgment in the exercise of his official duties.

(6) No State officer or employee should accept any gift, favor, service or other thing of value under circumstances from which it might be reasonably inferred: that such gift, service or other thing of value was given or offered for the purpose of influencing him in the discharge of his official duties.

(7) No State officer or employee should knowingly act in any way that might reasonably be expected to create an impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his trust as a State officer or employee.

Standard (1) prohibits "any business or transaction" which results in a "substantial conflict." The corresponding provision in the Lottery Code prohibits "any business or transaction ... which is in conflict with the proper discharge" of a commissioner's duties. Even if an ethical violation by Palley would taint Keyes Martin, neither the statute nor the Lottery Code prohibits Palley from having "any business relationship" at all with Keyes Martin. Because the Director determined no more than that, his determination cannot be the basis for rejecting Keyes Martin's bid. Without a finding of a "conflict" under the Lottery Code or a "substantial conflict" under the statute it cannot be said that Palley—much less Keyes Martin—has done anything wrong relating to standard (1).

Standards (4), (5), (6) and (7) appear in the Lottery Code virtually verbatim. They all depend in one way or another on "appearances" to the public but in each instance the appearance must be a reasonable inference from evidence that a conflict or violation of trust exists. As with all conflicts standards, the evidence need not demonstrate that the official forsook his public trust, but only that his private interests were in conflict with his public duty. *See Griggs v. Princeton Borough,* 33 *N.J.* 207, 220 (1960).

In my view if the Director had evidence that Keyes Martin was doing business with Palley's corporation to the extent that Palley was presented with a substantial conflict between his business interest with Keyes Martin and his duty to the public, he could properly have suspended Keyes Martin from bidding on this contract pending further investigation. *N.J.A.C.* 17:12-7.6. The fact that the Commission only later adopted regulations expressly barring a vendor from such conduct does not mean that in the absence of such regulations the conduct must be disregarded. Whether Keyes Martin should have been suspended here depends on the facts before the Director on May 31 and his evaluation of them.

The Director rejected the Keyes Martin bid under the authority of *N.J.S.A.* 52:34–12 which requires him to award a contract to a "responsible bidder" but permits him to reject "any bid" when he "determines that it is in the public interest to do so." The Supreme Court has held that " 'responsible' embraces moral integrity just as surely as it embraces a capacity to supply labor and materials." *Trap Rock Industries, Inc. v. Kohl,* 59 *N.J.* 471, 481 (1971), *cert.* den. 405 *U.S.* 1065, 92 *S.Ct.* 1500, 31 *L.Ed.*2d 796 (1972) (corporate bidder's principal indicted for bribery). The Director overruled Keyes Martin's objections after a hearing officer conducted an informal conference, the minimum procedural safeguard to which the maker of a rejected bid is entitled under *Commercial Cleaning Corp. v. Sullivan,* 47 *N.J.* 539, 550 (1966). That was the wrong procedure to use in this case.

The informal conference procedure called for in *Commercial Cleaning* should be limited to resolving disputes concerning a bidder's compliance with bid requirements and his ability to perform the contract in question. Where other disabilities arise such as the moral integrity of the bidder, including, as alleged here, conduct placing an official's public and private interests in substantial conflict, the Director should use the procedures established by regulation pursuant to Executive Order No. 34 (1976) for debarment, suspension and disqualification of a bidder. *N.J.A.C.* 17:12–7.1 *et seq.* These procedures, the Conflicts of Interest Law (*L.*1971, *c.* 182) and *Trap Rock* reflect a clear purpose of the three branches of government in the decade following *Commercial Cleaning* to establish broad standards administered under specific procedures that will assure ethical conduct and the appearance of ethical conduct in all phases of governmental activity.

*N.J.A.C.* 17:12–7.5 authorizes the Director to suspend "in the public interest ... a person for any cause specified in *N.J.A.C.* 17:12–7.2 [which lists reasons for debarment] or upon adequate evidence that such exists." *N.J.A.C.* 17:12–7.2(12) authorizes debarment for any cause "affecting responsibility as a State

contractor of such serious and compelling nature as may be determined by purchase and property to warrant debarment...." To be effective the Director's action must be approved by the Attorney General, *N.J.A.C.* 17:12–7.6. The suspension may not "be based upon unsupported accusation, but upon adequate evidence that cause exists or upon evidence adequate to create a reasonable suspicion that cause exists," *N.J.A.C.* 17:12–7.6(a)(3), and may only be "for a temporary period pending the completion of an investigation and such legal proceedings as may ensue." *N.J.A.C.* 17:12–7.7(a)(1)(iii).

On May 31 the Director could have had a "reasonable suspicion" that Keyes Martin knew or should have known that its private business dealings with Palley were forbidden under the Conflicts of Interest Law and the Lottery Code. If the Director had such a suspicion he could have suspended Keyes Martin with the approval of the Attorney General pending completion of an investigation, and his award of the contract to Venet would have been proper.

The State had an opportunity to proceed properly but failed to do so. Further proceedings will consume more contract time that may belong to Keyes Martin. I would nevertheless be indulgent of the State for several reasons: the Director and the Attorney General were caught up in a whirlwind of extraordinary events that distracted everyone when these matters were being considered below; it was urgent to have someone immediately under contract; and there was uncertainty in the law regarding the applicability of the debarment, suspension and disqualification procedures. Above all, I would give the State another chance in consideration of the following pronouncement by our Supreme Court:

> Nonetheless the purpose of a procurement program is not to advance the interest of those who want the State's business. On the contrary, the purpose is to serve the State's interest as purchaser. [*Trap Rock Industries, Inc. v. Kohl, supra,* 59 *N.J.* at 479]

I would remand for further proceedings consistent with this dissent.